IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF EASTERN PENNSYLVANIA

| | |
|---|---|
| JOHN DOE <br><br> Plaintiff, <br><br> v. <br><br> TEMPLE UNIVERSITY <br><br> Defendant. | CIVIL ACTION NO: 2-23-cv-4433 |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF JOHN DOE'S MOTION TO PROCEED UNDER A PSEUDONYM**

**I.     INTRODUCTION**

Plaintiff, an employee of Defendant Temple University, alleges *inter alia* that he was terminated because of his life-threatening and uncurable disease, and in retaliation for taking FMLA leave after being hospitalized in the ICU for six weeks, and ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ a▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ Plaintiff moves this Court for an order permitting him to litigate this action under a pseudonym. Plaintiff's name is known to Defendant, is being made available to the Court in connection with this motion (via Plaintiff's signed affidavit), and, upon a showing of good cause, disclosed to witnesses as needed. Otherwise, Plaintiff seeks to litigate this matter under a pseudonym in order to minimize the possibility that his current employer or future employers will learn about his disability from this lawsuit, terminate him, and leave him uninsured or underinsured if and when his disease results in another life-threatening crisis in which rapid and unimpeded medical treatment would be necessary.

At present, Plaintiff's disease is dormant, and non-visible—a hidden disability. His current employer has no knowledge of his disability. Plaintiff has the reasonable fear public disclosure of his life-threatening disease in connection with this lawsuit would significantly increase the risk of

1

being unlawfully terminated by his present employer, and would significantly limit his ability to be hired in any new position due to similar discrimination. Plaintiff's concern is not, however, the economic harm loss of employment would bring, but rather, the catastrophic and life-threatening consequences that may attend the lack of employer-sponsored health insurance if his next crisis coincides with such unemployment.

Accordingly, for the reasons set out in more detail below, Plaintiff asks the Court to grant his motion and permit him to proceed in this litigation with a pseudonym.

## II. ARGUMENT

### A. Courts permit a party to proceed under a pseudonym where the party has a reasonable risk that disclosing his or her identity could result in severe harm.

Though the presumption is parties proceed in litigation under their own names, in exceptional cases, courts have allowed a party to proceed under a pseudonym. *See Doe v. Megless*, 654 F.3d 404, 408 (3d Cir. Pa. 2011). That a party may suffer embarrassment or economic harm if their name is publicly released is not sufficient to allow anonymity; rather, a plaintiff must show both a fear of severe harm and that the fear of severe harm is reasonable. *Megless,* 654 F.3d at 408. Where a plaintiff advances a reasonable fear that litigating without a pseudonym could result in severe harm, courts then balance the plaintiff's interest and fear against the public's interest in an open litigation process.

The Third Circuit has adopted a list of non-exhaustive factors for the Court to consider in exercising in conducting this balancing test. *Megless*, 654 F.3d at 409-10. Factors favoring anonymity include:

> "(1) the extent to which the identity of the litigant has been kept confidential; (2) the bases upon which disclosure is feared or sought to be avoided, and the substantiality of these bases; (3) the magnitude of the public interest in maintaining the confidentiality of the litigant's identity; (4) whether, because of the purely legal nature of the issues presented or otherwise, there is an atypically weak public interest

2

in knowing the litigant's identities; (5) the undesirability of an outcome adverse to the pseudonymous party and attributable to his refusal to pursue the case at the price of being publicly identified; and (6) whether the party seeking to sue pseudonymously has illegitimate ulterior motives."

*Id.*

Factors disfavoring anonymity include:

"(1) the universal level of public interest in access to the identities of litigants; (2) whether, because of the subject matter of this litigation, the status of the litigant as a public figure, or otherwise, there is a particularly strong interest in knowing the litigant's identities, beyond the public's interest which is normally obtained; and (3) whether the opposition to pseudonym by counsel, the public, or the press is illegitimately motivated."

*Id.*

The "heart of the inquiry" is whether "Plaintiff risk[s] severe harm by proceeding under his or her real name" and, if so, "is this risk outweighed by a particularly strong public interest in knowing the Plaintiff's identity?" *Doe v. Pa. Dep't of Corr.,* No. 4:19-CV-01584, 2019 U.S. Dist. LEXIS 189748, at *4, n. 10 (M.D. Pa. Nov. 1, 2019).

Thus, to proceed anonymously, the plaintiff must first demonstrate "both (1) fear of severe harm, and (2) that the fear of severe harm is reasonable." *Megless,* 654 F.3d at 408. "Examples of areas where courts have allowed pseudonyms include cases involving abortion, birth control, transsexuality, mental illness, welfare rights of illegitimate children, AIDS, and homosexuality." *Id.* However, A plaintiff's fear that he may suffer embarrassment or economic harm does not suffice. *Id.*

While embarrassment alone does not typically suffice to establish a severe harm or the fear of same, stigmatization that "aggravates a condition" does justify anonymity. *Doe v. Rutgers,* No. 2:18-cv-12952-KM-CLW, 2019 U.S. Dist. LEXIS 75139, at *6 (D.N.J. Apr. 30, 2019). Courts have also permitted anonymity where the plaintiff showed revealing his name would place him in greater danger of losing his life. *Doe v. United States Dep't of State,* Civil Action No. 1:15cv1971,

3

2015 U.S. Dist. LEXIS 173937, at *6 (D.D.C. Nov. 3, 2015). Courts have permitted cases involving transgender plaintiffs to proceed anonymously because of the significant stigma and increased likelihood of violence against transgender individuals, as evidenced by both anecdotal and statistical evidence. *Doe v. Drexel Univ.,* No. 23-3555-KSM, 2023 U.S. Dist. LEXIS 214829, at *8 (E.D. Pa. Dec. 4, 2023). Courts have also found a well-founded fear of severe harm in cases of sexual assault, where revealing the assault would "cause further emotional trauma and humiliation," and/or they might be "stigmatized in both their personal and professional lives." *Doe A.F. v. Lyft, Inc.,* No. 23-3990-KSM, 2023 U.S. Dist. LEXIS 223388, at *9 (E.D. Pa. Dec. 15, 2023).

Likewise, courts have found that the threat of retribution and retaliation against objectors to Covid-19 vaccine mandates warranted allowing the case to proceed pseudonymously, at least at the outset of the case. *See, e.g., Navy Seal 1 v. Austin,* No. 8:21-cv-2429, 2022 U.S. Dist. LEXIS 31641, 2022 WL 520829, at *1-2 (M.D. Fla. Feb. 18, 2022); *Air Force Officer v. Austin,* No. 5:22-cv-00009-TES, 2022 U.S. Dist. LEXIS 26653, at *6 (M.D. Ga. Feb. 15, 2022); *Does 1 through 11 v. Bd. of Regents of the Univ. of Colo.*, No. 21-cv-02637, 2022 U.S. Dist. LEXIS 2050, 2022 WL 43897, at *5 (D. Colo. Jan. 5, 2022); *Does 1-2 v. Hochul,* 21-CV-5067, 2022 U.S. Dist. LEXIS 49960, 2022 WL 836990, at *10 (E.D.N.Y. Mar. 18, 2022); *Does v. Mills,* No. 1:21-cv-00242-JDL, 2021 U.S. Dist. LEXIS 167020, at *5 (D. Me. Sep. 2, 2021).

Courts allow pseudonymity if there is a reasonable fear of retaliatory physical harm . . . which should be considered based on the severity of the threatened harm and the party's unique vulnerability to such harm. *Does I thru XXIII v. Advanced Textile Corp.,* 214 F.3d 1058, 1068 (9th Cir. 2000). For instance, where a party's heart condition and use of blood thinners magnified the risk of severe harm if he were to be retaliated against, the court allowed the party to proceed

4

anonymously, even though the risk of retaliation was speculative. *Doe v. Heil,* No. 08-cv-02342-WYD-CBS, 2008 U.S. Dist. LEXIS 94551, at *9 (D. Colo. Nov. 13, 2008). Other courts have permitted pseudonymous proceeding in cases of non-mental-illness medical conditions where the medical conditions have been severe. *See, e.g., Heather K. v. City of Mallard,* 887 F. Supp. 1249, 1256 (N.D. Iowa 1995) (allowing anonymous proceeding due to the plaintiff's respiratory and cardiac issues); *Doe v. Nw. Mem'l Hosp.,* 2014 IL App (1st) 140212, ¶ 42, 385 Ill. Dec. 620, 636, 19 N.E.3d 178, 194 (permitting anonymity where cancer caused infertility); *Roe v. Catholic Health Initiatives Colo.,* Civil Action No. 11-cv-02179-WYD-KMT, 2012 U.S. Dist. LEXIS 713, at *12 (D. Colo. Jan. 4, 2012) (permitting anonymity in ADA suit where plaintiff used opiates for back-pain).

To be sure, many courts have rejected run-of-the-mill medical privacy concerns as being insufficient to warrant proceeding anonymously. But the above precedent identifies how a court should determine when medical privacy justifies anonymity: when the disclosure will or could cause unusually severe medical harm. Such a limiting principle is consistent with analogous circumstances, such as where the disclosure of a prisoner's history of sexual abuse would create a heightened risk of harm at the hands of other inmates, *Doe v. Ayers,* 789 F.3d 944, 945 (9th Cir. 2015), or allowing anonymity where the reputational and economic harm was accompanied with the threat of extraordinary retaliatory measures, such as deportation, arrest, and imprisonment, *Advanced Textile,* 214 F.3d at 1071, or where disclosure would threaten recovery from a longstanding eating disorder, *Lauren B. v. Baxter Int'l Inc. & Subsidiaries Welfare Benefit Plan for Active Emps.,* 298 F.R.D. 571, 573 (N.D. Ill. 2014). However, what is equally clear is that the risk need not be **certain** to justify anonymity; in both the Covid-19 vaccination cases and transgender cases, anonymity is permitted not because retaliation is assured, but because there is

5

a heightened risk of retaliation, the plaintiffs' fears were reasonable, and, because the retaliation could be catastrophic, the harm to be avoided was severe.

    **B. Plaintiff fears disclosing his disability will expose him to increased employment discrimination, which, in turn, jeopardizes his access to health insurance which is needed to pay for the incredibly expensive medical procedures necessary to treat his permanent and life-threatening disease.**

Here, Plaintiff has set forth in the attached Affidavit and accompanying exhibits (a) the severe harm he fears could result from the public disclosure of his identity; and (b) why that fear is reasonable. *See* Affidavit of Plaintiff, *attached hereto as* Exhibit A ("Pl. Aff."). In short, however, Plaintiff, a professor of statistics, fears disclosure of his medical condition because his research has convinced him that his probability of lacking acceptable health insurance at the time of a life-threatening flare-up of his permanent disease is as much as 1.5 times higher if his disability is disclosed as if it remains hidden, Pl. Aff. at ¶¶ 50-51, and, because both his disease and public disclosure are permanent, the probability of such a catastrophic outcome (up to and including death) is cumulative such that even a 1% annual chance of such a catastrophe would mean a 21% chance of such catastrophe occurring before he becomes eligible for Medicare at age 65. *Id.*

Plaintiff's fear is not based on vague speculation, but on evidence and expert reasoning. First, unlike many disabilities covered by the Americans with Disabilities Act, Plaintiff's ▮▮▮▮▮▮▮▮▮▮▮▮▮ is life-threatening and permanent, and results in periodic life-threatening crises, which can be triggered by ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *Id.* at ¶ 20, 22, 23. Moreover, such treatment is ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████ *Id.* at ¶¶ 24-25. *See also* ████████

████████████████████████████████████████████████████████████

████████ attached as Exhibit A-4 (████████████████████████████

████████████████████████████████████████████

Second, Plaintiff has strong reason to believe different insurance companies will cover or deny Plaintiff's treatments at different rates. There is considerable evidence that health insurance companies fail to cover ████████ because of their cost and because they may deem the treatment beneficial but not necessary. Pl. Aff. at ¶ 26; ████████████████████████

██████████████████████████████████████████████████████████G

████████████████████████████████████████████████████████████

████████████████████████████████ (last visited Feb. 15, 2024); ████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████████ *attached hereto as* Exhibit A-6.

Currently, Plaintiff is employed by a ████████████████ and has employer-sponsored health insurance through Aetna. Pl. Aff. at ¶ 27. In a 2011 study published by the California Nursing Association looking at claim denial by the largest California health insurers, Aetna denied claims at a rate of only 5.9%, while the average denial rate for all seven of the largest insurance

companies was 26%. *See* California Nurses Association/National Nurses United, *California Insurers Continue to Deny 26% of All Claims*, PR Newswire, Jan. 31, 2011, https://www.prnewswire.com/news-releases/california-insurers-continue-to-deny-26-of-all-claims-114945379.html (last visited Feb. 15, 2024), attached as Exhibit A-7.

If Plaintiff lost his job, this would not guarantee he would lose health insurance; he would attempt to purchase health insurance, if he could afford it, on the individual marketplace. Pl. Aff. at ¶ 28. Accordingly, in connection with this motion, Plaintiff went on to the marketplace to assess the insurance he might be able to purchase. *Id.* at ¶ 29. His research showed that—at least as of today—he would be unable to get health insurance through Aetna, and the only insurance plan that disclosed that it would even ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ **and** which his specialist physician is in-network was a Cigna insurance plan. *Id.* at ¶ 30. Problematically, however, Plaintiff's research has shown that Cigna may be one of the worst offenders as to denying expensive claims. *Id.* at ¶¶ 31-34; Ex. A-7; Patrick Rucker, Maya Miller, David Armstrong, *How Cigna Saves Millions by Having its Doctors Reject Claims without Reading Them*, PROPUBLICA, March 25, 2023, *available at* https://www.propublica.org/article/cigna-pxdx-medical-health-insurance-rejection-claims (last visited Feb. 15, 2024); *Kisting-Leung* Complaint, *attached as* Exhibit A-9; *Van Pelt* Complaint, *attached as* Exhibit A-10.

Accordingly, Plaintiff believes that if he were to lose his employer-sponsored health insurance with Aetna, and was forced to purchase Cigna insurance in the individual marketplace, there would be a significantly greater likelihood that ▇▇▇▇▇▇▇▇▇▇▇▇▇▇ coverage for treatments would be denied or delayed, and this could result in worsening of symptoms, extreme physical harm, or death. Pl. Aff. at ¶ 35. Likewise, if Plaintiff is forced to switch to a different specialist because he lost his current employer-sponsored insurance, he is concerned that the disruption in

the continuity of care would also lead to worse health outcomes in the event of the ▌▌▌▌▌. *Id.* at ¶ 36.

Accordingly, Plaintiff has a reasonable fear that if he loses his current job, and/or if his ability to find new employment is compromised, this will substantially raise the risk of severe adverse health outcomes—up to and including death—if such unemployment coincided with his ▌▌▌▌▌ Given same, Plaintiff has sought to assess the impact of a public and permanent disclosure of his disability on his ability to secure and retain employment. His research into same exacerbated rather than alleviated his concerns.

Plaintiff reviewed data from the U.S. Department of Labor for 2023 which showed that for Asian Americans without a disability, age 16-64, the employment population ratio was 75.6% and the unemployment rate was 2.9%, while for Asians with a disability, the employment population ratio was 34.3%, and the unemployment rate was 7.5%. *See id.* at ¶ 37; Disability Employment Statistics, Office of Disability Employment Policy, U.S. Department of Labor, https://www.dol.gov/agencies/odep/research-evaluation/statistics (last visited Feb. 15, 2024). Moreover, this data showed that individuals with disabilities were more likely to be either part-time or self-employed, meaning their access to employer-sponsored healthcare was more limited than individuals without disabilities. *Id.*

In another study reviewed by Plaintiff, survey data showed more than 30% of employees self-identified as having a disability, while only 3.2% of individuals self-identified their disability to their employers, and 62% of such individuals had "hidden", i.e., disabilities which individuals could avoid disclosing. Pl. Aff. at ¶ 39; Laura Sherbin, Julia Taylor Kennedy, Pooja Jain-Link, and Kennedy Ihezie, *Diversity and Inclusion, U.S. Findings*, 4, Coqual (2017), *attached hereto as* Exhibit A-11. Importantly and troublingly, 44% of those with "visible" disabilities reported

discrimination, while only 30% of employees with "hidden" disabilities experienced discrimination. *Id.* In other words, this study showed an individual with a "visible" disability is approximately 1.5 times more likely to be discriminated against than an individual with a "hidden disability." *Id.* Given Plaintiff's medical condition is dormant, Plaintiff's condition most resembles a hidden visibility. Pl. Aff. at ¶ 40. However, public and permanent disclosure of his disease as part of this proceeding would make his disability **permanently** visible to employers and potential employers. *Id.* at ¶ 41. And Plaintiff's research showed that terminations are the most common employment action complained of in charges submitted to the EEOC alleging disability discrimination in violation of the ADA. *Id.* at ¶ 42.

Additional studies Plaintiff reviewed which involved rigorous matched-pair testing demonstrated significant and systematic discrimination against individuals who disclosed their disability status to potential employers. *Id.* at ¶ 43. Matched-pair testing involves sending two job applicants with the same qualifications to employers, with one disclosing a disability. In the first study he reviewed, 6,016 job applications were submitted to advertised openings for accounting positions, split evenly among applications that did not mention disability, those that disclosed the applicant has a spinal cord injury, and those that disclosed the applicant has Asperger's syndrome. *See* Mason Ameri, et al., *The Disability Employment Puzzle: A Field Experiment on Employer Hiring Behavior,* 71 ILR REVIEW 329 (2018), working paper version available at https://www.nber.org/papers/w21560 (last visited Feb. 15, 2024). This study showed that applicants with disabilities received 26% fewer expressions of employer interest than those without disabilities. *Id.* A similar matched-pair field experiment Plaintiff reviewed which was conducted in Norway found that disclosing the use of a wheelchair reduced the probability of being invited to an interview by 48%. *See* Vegar Bjørnshagen and Elisabeth Ugreninov, *Disability*

10

*Disadvantage: Experimental Evidence of Hiring Discrimination against Wheelchair Users*, 37 EUROPEAN SOCIOLOGICAL REVIEW 818, 825 (2021), *attached hereto as* Exhibit A-12. A third study showed applicants to jobs in the New York fashion industry who disclosed disabilities received job offers at 27.3% the rate of their equally qualified partner. Mark Bendick, Jr., *Employment Discrimination against Persons with Disabilities,* 17 The International Journal of Diversity in Organizations, Communities, and Nations: Annual Review (2018), *available at* http://www.bendickegan.com/pdf/Bendick_Disabilty_Testing_2018.pdf, *attached hereto as* Exhibit A-13. And compellingly, these studies and statistics were consistent with Plaintiff's own experience when he was denied tenure and terminated by Defendant. Pl. Aff. at ¶ 44.

Based on this information, and his expertise as a professor of statistics with a doctorate from ▓▓▓▓▓ Plaintiff reasonably **fears** based on empirical evidence that if his health information and disability is permanently disclosed to the public through having to prosecute this lawsuit using his real name, he will be significantly more likely to be subjected to disability discrimination resulting in termination, and will be significantly and permanently compromised in his ability to maintain his employment or secure new employment. *Id.* at ¶ 45.

Disability discrimination is an injustice and a hardship for any individual, but for Plaintiff, such discrimination could prove catastrophic because of the intersection between the life-threatening nature of his disability, its permanence, the permanence of public disclosure in this lawsuit, and the extremely high cost of treatment which makes retaining the best health insurance possible—in this case, employer-sponsored—critical to minimizing his risk of a catastrophic outcome, up to and including his death. Accordingly, Plaintiff's fear of severe harm resulting from disclosure of his disability is reasonable, and supports permitting him to proceed in this action via a pseudonym.

Plaintiff reasonably considers ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ while without adequate health-insurance a grave and compelling risk which he must minimize to every extent possible, because such a circumstance has an extremely high likelihood of death or severe harm. *Id.* at ¶ 46. Minimizing this risk is even more important because the Plaintiff is a husband and the father of an eight-year-old. *Id.* at ¶ 4.

Because both his disease and public disclosure are permanent, when assessing the probability of catastrophe, Plaintiff must calculate the **cumulative probability** to correctly assess his risk. Defining the "failure condition" as being without adequate insurance at the same time he is suffering from a ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇, resulting in both severe medical harm and/or death, for any given probability of "failure" in each year, Plaintiff calculates the cumulative probability of the "failure" condition occurring at least once in the next 23 years as follows:

| Probability of failure in each year | Probability of failure at least once in the next 23 years |
|---|---|
| 1% | 21% |
| 2% | 37% |
| 3% | 50% |
| 4% | 61% |
| 5% | 69% |
| 6% | 76% |
| 7% | 81% |
| 8% | 85% |
| 9% | 89% |
| 10% | 91% |

*Id.* at ¶¶ 46-49.

The probability of "failure" as defined above is affected by (a) the probability of job loss or being employed but without acceptable medical insurance; (b) the probability of a ▇▇▇▇▇▇ ▇▇▇▇ flare-up; (c) the probability that marketplace medical insurance will not cover the treatment.

*Id.* at ¶ 50. Plaintiff's research has shown him that the probability of job loss if his disability is disclosed may be as much as 1.5 times more likely than if his disability can remain hidden, and he may have only 25% the chance of finding a new job if his disability is disclosed. *Id.* at ¶ 51. And because even a 1% chance of failure in any given year will result in a 21% chance that catastrophe will occur in the next 23 years, Plaintiff believes it to be imperative he do everything within his power to decrease the risk of such failure. *Id.* at ¶ 52. And, indeed, protecting his disability from public (or, for that matter, non-public) disclosure is one of the only factors over which Plaintiff can exercise significant control. *Id.* at ¶ 53.

In game theory, where the stakes are catastrophic, the most reasonable strategy to pursue may be a Minmax strategy—minimizing the possible loss for a worst-case (maximum loss) scenario. *Id.* at ¶ 54. Where the stakes are Plaintiff's life, Plaintiff certainly finds that course of action difficult to reject. *Id.* at ¶ 57. Nevertheless, Plaintiff's termination has **also** significantly increased his risk of catastrophe, because if he had been granted tenure, his risk of having inadequate health insurance at the time of his next flare-up would have been essentially zero, and prosecuting this lawsuit to a judgment in his favor will provide him another path to minimizing his risk of severe harm or death. *Id.* at ¶¶ 55-56. Accordingly, Plaintiff finds himself on the horns of a terrible dilemma, where receiving a judgment in his favor would significantly decrease the chance of being inadequately financially prepared for the next flare-up, but seeking that outcome will also drastically **increase** the chance of catastrophe, regardless of whether he secures a judgment against Defendant.

In such cases, Plaintiff clearly and demonstrably has a risk of "severe harm" if his identity is disclosed, and, as shown above, that risk is more than reasonable. Plaintiff has not come fear this risk based on speculation or assumption, but based on research, statistical expertise, and

decision-theory. Accordingly, this key and critical factor—the bases upon which disclosure is feared or sought to be avoided, and the substantiality of these bases—supports permitting Plaintiff to prosecute this case via pseudonym.

The severe harm Plaintiff fears is of comparable magnitude and severity to the harms for which Courts have allowed plaintiffs to proceed under a pseudonym. The social stigma that might result from disclosing an abortion, or an individual's HIV status is significant, but must constitutes a less severe harm than dying from a lack of adequate health insurance ███████████████ ███████████████████████.

With respect to the remaining *Megless* factors, these factors also, when balanced, support anonymity. The first factor, for instance, considers the extent to which the Plaintiff's anonymity has been preserved, and favors Plaintiffs who make substantial efforts to maintain anonymity and limit disclosure of sensitive information to few other people. *Doe A.F. v. Lyft, Inc.,* No. 23-3990-KSM, 2023 U.S. Dist. LEXIS 223388, at *6 (E.D. Pa. Dec. 15, 2023). Plaintiff has kept his identity confidential and has not shared his diagnosis or medical condition with anyone other than his physicians, his attorneys, his spouse, and Defendant—i.e., only those who need to know. Pl. Aff. at ¶ 5. Accordingly, Plaintiff's maintenance of the confidentiality of his medical condition and the facts of this case and his efforts to avoid public revelation favor granting his motion. *See id.*; *Doe v. Trishul Consultancy, LLC,* 2019 U.S. Dist. LEXIS 169051, 2019 WL 4750078, at *4 (D.N.J. Sept. 30, 2019) (anonymity supported where plaintiff had minimized disclosure of the incident and had not spoken to members of the media about the incident or the case).

The third and fifth factors—the magnitude of the public interest in keeping Plaintiff's identity confidential and the undesirability of adverse outcomes which would result if the Plaintiff and plaintiffs like him did not bring these types of cases—likewise support permitting Plaintiff to

proceed pseudonymously. These factors support anonymity because ADA plaintiffs do not merely vindicate their own private dispute, but in fact vindicate the larger public policy of stopping disability discrimination. As Plaintiff's research uncovered, as much a third of individuals may have a qualifying disability under the ADA which must be protected, and the adversarial litigation process helps ensure that those individuals have access to equal opportunities in the workplace—which contributes both to economic and non-economic welfare of these individuals and society at large. However, if individuals vindicating these rights must reveal their identity even where doing so will result in an increased likelihood of economic ruin which, due to the life-threatening nature of their disease, will result in death, they simply will not do so. No one could criticize an individual in such a case for not coming forward, to protect themselves from this risk, but society is better off if they do. Accordingly, the public has an interest in making this easier, by permitting litigating under a pseudonym, rather than harder.

In contrast, the public's interest in knowing **who** Plaintiff is of far less importance. Plaintiff does not seek relief in the court of public opinion, but through the crucible of litigation, the weighing of evidence, and the application of law. It is this Court and the jury which will determine whether Defendant discriminated against Plaintiff, and the public does not need to know Plaintiff's identity for it to be confident that justice has been done. *See, e.g., Doe v. Pa. Dep't of Corr.,* No. 4:19-CV-01584, 2019 U.S. Dist. LEXIS 189748, at *6 (M.D. Pa. Nov. 1, 2019) (noting that because only the name of the plaintiff was being kept anonymous, the public would have access to everything else in the proceeding allowing for sufficient public monitoring of the case).

Finally, Plaintiff does not possess an ulterior motive for wishing to proceed anonymously. His motivation is to minimize the risk of a catastrophic outcome that would be significantly

15

increased by public revelation of his disability. As to the factors disfavoring anonymity, Plaintiff is not a public figure, and the subject matter of this litigation is not such that there is a particularly strong interest in knowing Plaintiff's identities beyond the public interest normally obtained. For instance, Plaintiff's complaint has not been reported on in the media, nor has the media contacted Plaintiff's counsel.

Thus, a weighing of the above *Megless* factors supports permitting Plaintiff to proceed with a pseudonym in this matter. Accordingly, the Court should grant Plaintiffs' motion.

### C. Regardless of whether Plaintiff can present his case to a jury while using a pseudonym, the Court should permit Plaintiff to proceed pre-trial without disclosing his name.

Occasionally, courts have found that parties are justified in using a pseudonym to litigate the case during the pretrial proceedings but not at trial. *See, e.g., Does I thru XXIII v. Advanced Textile Corp.,* 214 F.3d 1058, 1069 (9th Cir. 2000). "The balance between a party's need for anonymity and the interests weighing in favor of open judicial proceedings may change as the litigation progresses." *Id.*; *see also Lawson v. Rubin,* No. 17-cv-6404 (BMC) (SMG), 2019 U.S. Dist. LEXIS 181192, at *9 (E.D.N.Y. Oct. 17, 2019).

While the Court should grant Plaintiff's motion for the reasons set forth above, even if the Court were to conclude that the public interest in Plaintiff's identity outweighs his reasonable fear of serious harm if his identity is disclosed, the public interest in openness is significantly less at the pretrial stage. Accordingly, in the alternative to permitting Plaintiff to use a pseudonym at all stages of the litigation, the Court should at minimum permit Plaintiff to proceed with a pseudonym at least through the final pretrial conference.

## III. CONCLUSION

Accordingly, for the above reasons, the Court should grant Plaintiff's motion and permit him to pursue this litigation via pseudonym.

                                    Respectfully submitted,

                                    /s *Joshua S. Boyette, Esq.*
                                    Joshua S. Boyette, Esq.
                                    **SWARTZ SWIDLER, LLC**
                                    9 Tanner Street, Suite 101
                                    Haddonfield, NJ 08033
                                    Office: (856) 685-7420
                                    Fax: (856) 685-7417
                                    *Attorney for Plaintiff*

Date: February 15, 2024