**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| Xu Han : | |
| : | |
| *Plaintiff,* : | |
| : | |
| **v.** : | **Civil Action No. 2:23-cv-4433** |
| : | |
| **TEMPLE UNIVERSITY** : | |
| : | |
| *Defendant.* : | |
| : | |

**MEMORANDUM OF LAW OF TEMPLE UNIVERSITY – OF THE**
**COMMONWEALTH SYSTEM OF HIGHER EDUCATION IN SUPPORT OF ITS**
<u>**MOTION FOR SUMMARY JUDGMENT**</u>

Dated: April 25, 2025

/s/ Michael J. Fortunato
Michael J. Fortunato, Esquire
PA ID No.: 58917
mfortunato@rubinfortunato.com
Rachael Luken Carp, Esquire
PA ID No.: 201585
rcarp@rubinfortunato.com
Domenica B. Tomasetti, Esquire
PA ID No. 333913
dtomasetti@rubinfortunato.com
1200 Liberty Ridge Drive
Suite 220
Wayne, PA 19087
Telephone (610) 408-2005/2010/2045
Facsimile (610) 854-4305/4329/4304

*Attorneys for Defendant Temple University – of the Commonwealth System of Higher Education*

## TABLE OF CONTENTS

I.   INTRODUCTION ................................................................................. 1

II.  FACTS ................................................................................................ 3

III. LEGAL REASONING ......................................................................... 3

  A.  Legal Standards .......................................................................... 3

    1.  Rule 56 Summary Judgment Standard .............................. 3

    2.  The McDonnell Douglas Burden-Shifting Framework Applies to Discrimination and Retaliation Claims. ........................................ 4

      a)  Required Elements to Establish a *Prima Facie* Case of Discrimination ................................................................. 5

  B.  The Evidence is Insufficient to Establish the *Prima Facie* Elements of Discrimination ........................................................................... 7

    1.  The Record Indisputably Shows that Temple Did Not Treat Members Outside the Protected Class More Favorably and the Circumstances  Do Not Give Rise to an Inference of Discrimination. ................................ 7

      a)  Gender: Temple Treated Women and Men Equally ............................. 7

      b)  Race and National Origin: There Is No Evidence in the Record from Which a Factfinder Could Conclude that Temple Treated Chinese Asian Individuals Less Favorably than Temple Treated Non-Asian or Non-Chinese Individuals. ................................ 7

      c)  Age: There Is No Evidence in the Record from Which a  Factfinder Could Conclude that Temple Treated Individuals  Under 40 Years Old More Favorably than Those Over 40  Years Old ........................................ 10

      d)  Disability: There Is No Evidence in the Record from Which a Factfinder Could Conclude that Temple Denied Dr. Han  Tenure Because of His Disability ................................ 11

  C.  Dr. Han Cannot Establish a *Prima Facie* Case for Retaliation or  Interference  13

    1.  Retaliation under the ADA and PHRA ........................................ 13

      a)  The Record Reflects that No Causal Connection Exists. ................... 14

      i)  Request for an Accommodation ................................................. 14

      ii)  Complaint to Sandra Foehl ................................................ 15

      iii)  Complaint to the Provost ................................................ 16

**2.    Retaliation Under the FMLA** ........................................................ 17

**3.    Interference Under the FMLA** ...................................................... 18

**D.    The Record Reflects that Temple's Legitimate, Non-Discriminatory Reason  for Denying Dr. Han Tenure Was Not Pretextual** ........................................ 19

**1.    The Facts Show that Temple Denied Dr. Han Tenure for a Legitimate, Non-Discriminatory Reason** .................................................................... 19

**2.    Dr. Han is Unable to Establish Pretext Based on the Record.** ..................... 21

**3.    Disagreement With The Tenure Decision Does Not Establish Pretext** ....... 21

**a)    Multiple Levels Of Review Found Dr. Han's Tenure  Application Was Not Strong Enough To Grant Tenure** ........................................... 22

**b)    Alleged Procedural Irregularities In The Process Lack  Evidence Of Discrimination** ........................................................... 24

**IV. CONCLUSION** ....................................................................... 25

# TABLE OF AUTHORITIES

**Cases**

Allegheny Hous. Rehab. Corp. v. Pa. Human Relations Com'n,
   532 A.2d 315 (Pa. 1987) ............................................................................................ 6

Allen v. PetSmart, Inc.,
   512 F. Supp. 2d 288 (E.D. Pa. 2007) ........................................................................ 3

Atkinson v. Lafayette Coll.,
   460 F.3d 447 (3d Cir. 2006) ...................................................................................... 4

Barber v. CSX Distrib. Servs.,
   68 F.3d 694 (3d Cir. 1995) ................................................................................. 10, 12

Berckeley Inv. Group, Ltd. v. Colkitt,
   455 F.3d 195, 201 (3d Cir. 2006) .............................................................................. 3

Callison v. City of Philadelphia,
   430 F.3d 117, 119 (3d Cir. 2005) ............................................................................ 19

Celotex Corp. v. Catrett,
   477 U.S. 317, 322-23 (1986) .................................................................................. 3, 4

Connors v. Chrysler Fin. Corp.,
   160 F.3d 971 (3d Cir. 1998) ...................................................................................... 4

Curay-Cramer v. Ursuline Acad. of Wilmington, Del., Inc.,
   450 F.3d 130 (3d Cir. 2006) .................................................................................... 16

Duffy v. Paper Magic Group, Inc.,
   265 F.3d 163, 167 (3d Cir. 2001) .............................................................................. 6

Fireman's Ins. Co. v. DuFresne,
   676 F.2d 965 (3d Cir. 1982) ...................................................................................... 3

Fuentes v. Perskie,
   32 F.3d 759 (3d Cir. 1994) .................................................................................. 5, 21

Gardner v. SEPTA,
   410 F. Supp. 3d 723, 733 (E.D. Pa. 2019) ............................................................... 4

General Electric Corp. v. Pennsylvania Human Relations Com.,
   365 A.2d 649 (Pa. 1976) ............................................................................................ 6

Geraci v. Moody-Tottrup, Int'l, Inc.,
   82 F.3d 578, 581 (3d Cir. 1996) ................................................................................ 6

Gaul v. Lucent Techs., Inc.,
    134 F.3d 576, 580 (3d Cir. 1998) ............................................................................... 6

Hazen Paper Co. v. Biggins,
    507 U.S.604, 610 (1993) ........................................................................................... 21

Head v. City of Philadelphia,
    627 F. Supp. 3d 444 (E.D. Pa. 2022) ........................................................................ 19

Howell v. Millersville Univ. of Pa.,
    283 F. Supp. 3d 309 (E.D. Pa. 2017) ........................................................................ 25

Jones v. Sch. Dist. of Phila.,
    198 F.3d 403 (3d Cir. 1999) ........................................................................................ 4

Jones v. SEPTA,
    796 F.3d 323 (3d Cir. 2015) ........................................................................................ 6

Kroptavich v. Pa. Power & Light Co.,
    795 A.2d 1048, 1055 (Pa. Super. Ct. 2002) .............................................................. 6

Krouse v. American Sterilizer Co.,
    126 F.3d 494 (3d Cir. 1997) ........................................................................... 4, 13, 14

Kunda v. Muhlenberg Coll.,
    621 F.2d 532 (3d Cir. 1980) ...................................................................................... 22

Laverty v. Drexel Univ.,
    2016 U.S. Dist. LEXIS 6909 (E.D. Pa. Jan. 21, 2016) ............................................ 25

Marten v. Gordon,
    499 F.3d 290, 295 (3d Cir. 2007) ................................................................................ 4

Maxfield v. Sinclair Int'l,
    766 F.2d 788, 792 (3d Cir. 1985) .............................................................................. 10

McDonnell Douglas Corp. v. Green,
    411 U.S. 792 (1973) ...................................................................................... 4, 19, 21

McIntosh v. White Horse Vill., Inc.,
    249 F. Supp. 3d 796 (E.D. Pa. 2017) ................................................... 3, 6, 9, 13, 17

Molthan v. Temple Univ. of Commonwealth System of Higher Education
    778 F.2d 955, 962 (3d Cir. 1985).............................................................................. 22

Monaco v. Am. Gen. Assur. Co.,
    359 F.3d 296 (3d Cir. 2004) ....................................................................................... 6

Parker v. Verizon, Inc.,
  309 Fed. App'x. 551 (3d Cir. 2009) ................................................................. 5, 21

Pivirotto v. Innovative Sys., Inc.,
  191 F.3d 344, 352 (3d Cir. 1999) ........................................................................ 7

Prowel v. Wise Bus. Forms,
  579 F.3d 285 (3d Cir. 2009) ............................................................................... 3

Robinson v. City of Pittsburgh,
  120 F. 3d 1286, 1302 (3d Cir. 1997) ................................................................ 14

Ross v. Gilhuly,
  755 F.3d 185, 192 (3d Cir. 2014) ...................................................................... 19

Sanchez v. SunGard Availability Servs. LP.,
  362 F. App'x 283 (3d Cir. 2010) ....................................................................... 16

Sarullo v. United States Postal Serv.,
  352 F.3d 789 (3d Cir. 2003) (per curiam) ...................................................... 5, 6, 7

Shaner v. Synthes (USA),
  204 F.3d 494 (3d Cir. 2000) ............................................................................ 4, 6

Sommer v. The Vanguard Grp.,
  461 F.3d 397 (3d Cir. 2006) .............................................................................. 19

Veikos v. Trs. of the Univ. of Pa.,
  2022 U.S. Dist. LEXIS 12723 (E.D. Pa. Jan. 11, 2022) ................................... 4, 6

Wishkin v. Potter,
  476 F.3d 180, 185 (3d Cir. 2007) ........................................................................ 5

Wood v. Univ. of Pittsburgh,
  395 F. App'x 810 (3d Cir. 2010) .......................................................................... 4

Woodson v. Scott Paper Co.,
  109 F.3d 913 (3d Cir. 1997) ........................................................................... 4, 13

**Statutes**

29 U.S.C. § 621 ................................................................................................... 2, 4, 6

29 U.S.C. § 2601 .............................................................. 1, 2, 12, 13, 17, 18, 19, 24

42 U.S.C. § 1981 .............................................................................................. 2, 4, 5, 6, 9

42 U.S.C. § 2000e .......................................................................................... 2, 4, 5, 6, 9

42 U.S.C. § 12101 *et seq.* ............................................................................ 2, 4, 6, 13

43 Pa. Stat. Ann. § 951 et seq. ................................................................................................... 2, 4, 5, 6, 13

**Other**

Fed. R. Civ. P. 56 ................................................................................................................................ 3

I.     **INTRODUCTION**

Xu Han was a tenure-track statistics professor at Temple University in the Fox School of Business from 2012 until 2022.  Because tenure is a lifetime appointment, Temple – like most elite institutions – demands excellence from its candidates.  Tenure-track professors are required to apply for tenure by their sixth year of employment.  In Dr. Han's case, Temple expected him, among other things, to publish in top-quality journals in the statistics field.  Pursuant to the Collective Bargaining Agreement ("CBA") between Temple and Temple Association of University Professionals ("TAUP"), the University's *Promotion and Tenure Guidelines for Tenure Track Faculty* (the "Promotion and Tenure Guidelines") clearly delineate the tenure process and expectations.  Temple's 2018 *Promotion and Tenure Guidelines for Tenure Track Faculty* (the "2018 Guidelines"), the guidelines that governed Dr. Han's 2019-2020 and 2021-2022 applications for tenure, specifically state that the expectation for tenure is four publications in "A" journals and include a list of top-tier journals that are considered "A" journals.  The expectation of four publications in "A" journals is the floor, not the ceiling, in terms of baseline requirements.

While professors are expected to apply for tenure by their sixth year of employment, Temple's CBA provides that an applicant's tenure clock will be extended following approved leaves of absence.  During his employment, Dr. Han requested two leaves of absence under the Family Medical Leave Act ("FMLA"), both of which Temple granted.  Thus, rather than apply for tenure in the 2017-2018 academic year, Dr. Han applied for tenure for the first time in the 2019-2020 academic year.

When Dr. Han applied for tenure in 2019, Temple expected four "A" journal publications.  Dr. Han applied for tenure with only three publications in "A" journals, falling

short of the 2018 Guidelines.  By spring 2020, after receiving negative reviews of his tenure

packet, Dr. Han withdrew his application before Temple's Board of Trustees – the last level of

review in Temple's tenure review process – could deny tenure.  The CBA provided Dr. Han with

the opportunity to apply for tenure a second time, which he did in the 2021-2022 academic year.

Applying under the same 2018 Guidelines, Dr. Han expected a different outcome although he

still had only three "A" publications.  After a thorough and thoughtful review of his tenure

application, which traversed seven layers of review,[1] and during which Dr. Han submitted

voluminous rebuttals, Temple determined that Dr. Han did not meet the standards of excellence

necessary for an award of a lifetime appointment. These foregoing facts are undisputed.  Yet,

instead of acknowledging the possibility that he failed to meet the requisite standards to earn

tenure, Dr. Han has asserted an indiscriminate potpourri of allegations across seven statutory

causes of action:  age, race, national origin, ethnicity, sex, medical leave status, and disability,

pursuant to the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 *et seq*. (1990)

(ADA); Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e (1964) (Title VII) (race,

national origin, and gender); 42 U.S.C. § 1981 ("Section 1981") (race and ethnicity); the Age

Discrimination in Employment Act of 1967, 29 U.S.C. § 621 (ADEA); the Family and Medical

Leave Act of 1993, 29 U.S.C. § 2601 (FMLA) (retaliation and interference); as well as the

Pennsylvania Human Relations Act, 43 Pa. Stat. Ann. § 951 et seq. (PHRA) (disability, race,

gender, national origin, and age).  After extensive discovery, no genuine dispute of *material* fact

exists as to any one of Dr. Han's multiple and inconsistent causes of action, and Temple is

entitled to judgment as a matter of law.

---

[1] The seven layers of thoughtful review included the department committee, department chair, school
committee, school dean, university promotion and tenure committee, provost, and president, not including
the external reviewers and, ultimately, the Board of Trustees.

## II.    FACTS

Temple incorporates herein by reference its separately filed Joint Statement of Undisputed Material Facts ("SOF").

## III.    LEGAL REASONING

### A.    Legal Standards

#### 1.    Rule 56 Summary Judgment Standard

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, a motion for summary judgment shall be granted if the evidence in the record shows that there is "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  A fact is material if it could affect the outcome of the case under the substantive law.  McIntosh v. White Horse Vill., Inc., 249 F. Supp. 3d 796, 799 (E.D. Pa.  2017).  "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, *against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial*." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)(emphasis added). When considering a motion for summary judgment, all inferences must be "viewed in the light most favorable to the party opposing the motion."  See Prowel v. Wise Bus. Forms, 579 F.3d 285, 286 (3d Cir. 2009).  The rule does not require that "the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim."  Celotex Corp., 477 U.S. at 323.  The party opposing the motion cannot rely merely upon the allegations in the pleadings, bare assertions, conclusory allegations, or suspicions to support its claim.  Fireman's Ins. Co. v. DuFresne, 676 F.2d 965, 969 (3d Cir. 1982); Allen v. PetSmart, Inc., 512 F. Supp. 2d 288, 291 (E.D. Pa. 2007) (quoting Berckeley Inv. Group, Ltd. v. Colkitt, 455 F.3d 195, 201 (3d

Cir. 2006)).  Summary judgment must be entered against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Gardner v. SEPTA, 410 F. Supp. 3d 723, 733 (E.D. Pa. 2019) (citing Marten v. Gordon, 499 F.3d 290, 295 (3d Cir. 2007) (quoting Celotex Corp., 477 U.S. at 322-23)); see also Veikos v. Trs. of the Univ. of Pa., 2022 U.S. Dist. LEXIS 12723, at *1 (E.D. Pa. Jan. 11, 2022)(Wolson, J.).

Because Dr. Han cannot establish the essential elements of his causes of action based on the undisputed material facts in the record, this Court should grant summary judgment in favor of Defendant on each of Dr. Han's claims.

### 2.    The McDonnell Douglas Burden-Shifting Framework Applies to Discrimination and Retaliation Claims.

Dr. Han filed (among other things) claims of gender, age, national origin, disability, and race discrimination.  Courts apply the burden-shifting framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), to analyze these claims of discrimination under their respective statutes.  Atkinson v. Lafayette Coll., 460 F.3d 447, 454 (3d Cir. 2006) (Title VII and PHRA); Shaner v. Synthes (USA), 204 F.3d 494, 500 (3d Cir. 2000) (ADA); Wood v. Univ. of Pittsburgh, 395 F. App'x 810, 814 (3d Cir. 2010); see also Jones v. Sch. Dist. of Phila., 198 F.3d 403, 409-10 (3d Cir. 1999) (Section 1981); Connors v. Chrysler Fin. Corp., 160 F.3d 971, 972 (3d Cir. 1998) (ADEA).  Dr. Han also alleged claims for retaliation under the ADA and PHRA.  The Third Circuit analyzes these retaliation claims under the same burden-shifting framework.  See Krouse v. American Sterilizer Co., 126 F.3d 494, 500 (3d Cir. 1997); see also Woodson v. Scott Paper Co., 109 F.3d 913, 920 (3d Cir. 1997).  The McDonnell Douglas standard places the burden upon Dr. Han to establish a *prima facie* case of discrimination or retaliation on each of his claims by a preponderance of the evidence.  See Wood v. Univ. of

Pittsburgh, 395 F. App'x 810, 814 (3d Cir. 2010); see also Sarullo v. United States Postal Serv., 352 F.3d 789, 797 (3d Cir. 2003) (per curiam). Only if Dr. Han adduces sufficient evidence in the record to establish a *prima facie* case does the burden shift to Temple to articulate a legitimate, nondiscriminatory reason for the conduct at issue – here, Temple's decision not to grant Dr. Han tenure. Wood, 395 F. App'x at 814. Temple's burden is only a burden of production, not one of persuasion. Id. Once Temple articulates a legitimate, non-discriminatory reason for its decision not to grant tenure to Dr. Han, the burden again shifts to Dr. Han to prove that Temple's reason is a pretext for discrimination or retaliation. Id. (citing Wishkin v. Potter, 476 F.3d 180, 185 (3d Cir. 2007)).

To make a showing sufficient to establish pretext, Dr. Han must put forth evidence that a *reasonable* factfinder could "either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994). The evidence offered for a reasonable jury to disbelieve Temple's legitimate, non-discriminatory reason must be more than an incorrect decision or a mistake on behalf of the tenure committees. Parker v. Verizon, Inc., 309 Fed. App'x. 551, 556-57 (3d Cir. 2009) (citing Fuentes, 32 F.3d at 765).

### a) Required Elements to Establish a *Prima Facie* Case of Discrimination.

Even viewing the documents and deposition testimony in the light most favorable to Dr. Han, he is unable to establish a *prima facie* case of gender, race, and national origin discrimination in violation of Title VII, the PHRA, and Section 1981. Dr. Han must demonstrate that (1) he is a member of a protected class, (2) he was qualified for the position, (3) he suffered an adverse employment action, and (4) the employer treated similarly situated persons who are

not members of the protected class more favorably, or the adverse action occurred under circumstances giving rise to an inference of unlawful discrimination.  See Jones v. SEPTA, 796 F.3d 323, 327 (3d Cir. 2015); see also Veikos, 2022 U.S. Dist. LEXIS 12723 at *4; Sarullo, 352 F.3d at 797-98 (citing Geraci v. Moody-Tottrup, Int'l, Inc., 82 F.3d 578, 581 (3d Cir. 1996) (holding that the *prima facie* case must be tailored to fit the specific circumstances of the case)); Allegheny Hous. Rehab. Corp. v. Pa. Human Relations Com'n, 532 A.2d 315, 317 (Pa. 1987) (citing General Electric Corp. v. Pennsylvania Human Relations Com., 365 A.2d 649 (Pa. 1976) (holding that the PHRA adopted Title VII's model for establishing the *prima facie* case for employment discrimination)).  The substantive elements required to prove a *prima facie* case under Title VII and Section 1981 for race and national origin discrimination are generally identical, and thus Dr. Han's race and national origin claims will be addressed collectively in this analysis.  See McIntosh, 249 F. Supp. at 799-800.  For a claim of age discrimination, the ADEA alters the fourth prong, requiring Dr. Han to prove that he was ultimately replaced by a person sufficiently younger to permit an interference of age discrimination.  See Monaco v. Am. Gen. Assur. Co., 359 F.3d 296, 300 (3d Cir. 2004) (citing Duffy v. Paper Magic Group, Inc., 265 F.3d 163, 167 (3d Cir. 2001)); see also Kroptavich v. Pa. Power & Light Co., 795 A.2d 1048, 1055 (Pa. Super. Ct. 2002) (holding that claims brought under the PHRA are generally analyzed under their federal counterparts).

To establish the *prima facie* case for disability discrimination under the ADA, Dr. Han must establish sufficient facts to demonstrate that he (1) is a disabled person within the meaning of the ADA, (2) is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations, and (3) was denied tenure as a result of discrimination. Shaner, 204 F.3d at 500 (quoting Gaul v. Lucent Techs., Inc., 134 F.3d 576, 580 (3d Cir. 1998)).

**B.    The Evidence is Insufficient to Establish the *Prima Facie* Elements of Discrimination**

    **1.    The Record Indisputably Shows that Temple Did Not Treat Members Outside the Protected Class More Favorably and the Circumstances Do Not Give Rise to an Inference of Discrimination.**

Dr. Han cannot point to disputed material facts in the record to support an inference of discrimination, whether on the basis of gender, race, national origin, age, or disability.  When determining whether a plaintiff can establish that an adverse employment action raises an inference of discriminatory animus, the court's central focus is on whether the employer treats people within the protected class less favorably than others outside the protected class.  Sarullo, 352 F.3d at 798 (citing Pivirotto v. Innovative Sys., Inc., 191 F.3d 344, 352 (3d Cir. 1999)).

**a)    Gender: Temple Treated Women and Men Equally**

Temple is entitled to summary judgment on this claim because no evidence exists to support Dr. Han's contention that he was treated less favorably than the women in his Department, or that Temple denied him tenure because he is a man.  In fact, during Dr. Han's first tenure application, Temple denied tenure to two other applicants – both of whom were women.  See SOF Exhibit A: Han Transcript (hereinafter "Tr."). at 277:13-24; 278:1-24; 279:1. Without any facts, let alone disputed material facts, to support an inference of discrimination, Dr. Han's gender discrimination claim fails as a matter of law.

**b)    Race and National Origin: There Is No Evidence in the Record from Which a Factfinder Could Conclude that Temple Treated Chinese Asian Individuals Less Favorably than Temple Treated Non-Asian or Non-Chinese Individuals.**

In his Amended Complaint, Dr. Han alleged that Temple used a gender-race-national-origin quota system for diversity in the Statistics Department.  See Amended Complaint ¶ 75. This allegation requires that the Court consider Dr. Han's claims for gender, race, and national origin discrimination in tandem.  In other words, Dr. Han is not claiming that he was

7

discriminated against solely because he is Chinese or solely because he is Asian and he has provided no evidence to support either claim, standing alone.  Rather, he asserts that the alleged discrimination stemmed from his status as a Chinese male or an Asian male or an Asian male of Chinese origin.

During Dr. Han's deposition, when asked if Temple denied him tenure simply because he is Asian, Dr. Han replied: "[n]ot simply because I'm Asian.  There are other factors."  See SOF Exhibit A: Han Tr. at 77:14-20.  When asked if he was denied tenure simply because he is Chinese, Dr. Han replied again: "[t]here are other factors."  Id. at 77:22-24; 78:1-3.  When asked if he was denied tenure for simply being a man, Dr. Han answered once more that "there are other factors."  Id. at 78:5-10.  Moreover, he specifically testified that he did not believe Temple discriminated against others of the Asian race or against Chinese women.  For example, when asked whether Indian men (who are of South Asian descent) in his Department shared the same concerns of a quota system, Dr. Han confirmed that there were no concerns for Indian males.  Id. at 60:18-21.

Dr. Han also undermined his standalone claims of race and national origin discrimination by naming two Asian female professors of Chinese descent (Connie Mao and Crystal Kong) as comparators to try to establish that allegedly less qualified individuals outside of one of his protected classes (male) were treated more favorably than he was.  Id. at 270:16-24; 271:1-24; 273:21-24; 274:1-20; 275:11-24; 276:1-23.  Dr. Han's use of Asian, Chinese women as comparators who received tenure and promotion, despite his belief that they fell short of the standard, undercuts any contention that Temple discriminated against Dr. Han for being Asian or for being Chinese.  The difference between Dr. Han and those two supposed comparators is gender.

However, Temple would be remiss if it did not address Dr. Han's claims for race and national origin as standalone claims. Dr. Han has provided zero evidence that he was, or other Chinese and/or Asian professors were, treated less favorably than tenure applicants of different races or national origin. During Dr. Han's deposition, Temple questioned the basis for his allegations of race and national origin discrimination. Dr. Han merely speculated, without proof, that Temple had a quota system for the Statistics Department. See SOF Exhibit A: Han Tr. at 59:6-11. Dr. Han explained how he formed this belief, stating, "Well, that's based on the worries…." Id. at 59:11-14. He elaborated, stating that his concerns of a quota system developed through conversations with two Chinese male colleagues who were applying for tenure. Id. at 53:5-24; 54:1-24; 55:1-24; 56:1-24; 57:1-24; 58:1-24; 59:1-24; 60:1-21. Dr. Han testified that he never discussed or heard talk of a quota system from anyone in leadership at Temple. Id. at 60:3-8. Dr. Han also testified that his Chinese male colleagues both received tenure. Id. at 54:11-14.

Dr. Han also has presented no evidence that Temple filled his position in the Statistics Department with a non-Asian and non-Chinese individual with similar qualifications. In McIntosh, the court held that the plaintiff failed to establish her *prima facie* case for race discrimination under Title VII and Section 1981 due to her failure to prove the fourth prong (i.e., treating members outside of the protected class more favorably). 249 F. Supp. at 800. To succeed on her claims, the plaintiff, an African-American woman, needed to present evidence that "she was replaced by a similarly qualified person who was not African-American." Id. The plaintiff could not produce such evidence and the court granted summary judgment in favor of the defendant. Id. The same result is warranted in this case.

      **c)**     **Age: There Is No Evidence in the Record from Which a Factfinder Could Conclude that Temple Treated Individuals Under 40 Years Old  More Favorably than Those Over 40 Years Old**

There is no evidence in the record from which Dr. Han can establish that Temple's decision to deny him tenure occurred under circumstances that give rise to an inference of age discrimination.  No genuine issue of material fact exists that Temple wanted a younger candidate, granted tenure to someone younger with the same qualifications, or replaced Dr. Han with a younger professor.  In fact, Dr. Han was younger than 40 years old during his first tenure application and had just turned 40 when he applied for tenure the second time.  See SOF ¶ 72.  The law is clear that, while no magic age gap is required between two individuals, the gap must be sufficiently wide enough to give rise to an inference of discrimination.  Barber v. CSX Distrib. Servs., 68 F.3d 694, 699 (3d Cir. 1995).  The plaintiff must show that the beneficiary of the alleged discrimination is "sufficiently younger" for the court to find an inference of discrimination.  Id. (citing Maxfield v. Sinclair Int'l, 766 F.2d 788, 792 (3d Cir. 1985)).

Here, Dr. Han has identified no comparator and was, himself, decades younger than several other members of the Statistics Department.  Logically speaking, it would be almost impossible for a candidate to be much younger than 40 when applying for tenure.  A PhD in Statistics takes approximately six years to complete.  See SOF ¶ 6.  Assuming a candidate finishes an undergraduate degree at 22 years old and pursues a PhD immediately thereafter, the candidate would be no younger than 28 years old.  Temple's policy then requires a candidate to apply for tenure in their sixth year of employment with Temple.  Thus, assuming Temple hired a tenure-track faculty member immediately after completing a doctorate, and that candidate applies for tenure in their sixth year of employment, the youngest tenure applicant would be 34 years old.  However, many applicants receive extensions following the birth of a child or a medical

10

leave of absence, pushing the age closer to 35 or 36 for those individuals. At 38 years old during his first tenure application, and 40 years old during his second application, Temple considered Dr. Han to be a young faculty member. See SOF ¶ 45. Dr. Han himself testified that tenured faculty members work into their 70s. See SOF Exhibit A: Han Tr. at 292:2-14. The Fox School and the Statistics Department are populated with many older, tenured faculty members. Id. at 292:2-9.

Second, tenure is a unique, lifelong appointment in part because universities recognize that a person's body of research develops over the course of their career. Professors continue to publish late into life. The purpose of tenure is to foster a creative environment for professors to expand their reach as thought leaders in their field over a period of years or decades. Dr. Han's argument that Temple sought younger tenure candidates is unsupported by the record and misunderstands the purpose of tenure. Temple did not seek younger professors or give preferential treatment to professors "sufficiently younger" than 40, and Dr. Han has offered no comparator to establish that Temple replaced him with a "sufficiently younger" professor in the Statistics Department. Because Dr. Han has failed to make a showing sufficient to establish a *prima facie* case for age discrimination, this judgment should be entered as a matter of law.

> **d)      Disability: There Is No Evidence in the Record from Which a Factfinder Could Conclude that Temple Denied Dr. Han Tenure Because of His Disability**

Dr. Han developed no factual support for his claim that Temple denied him tenure because of his disability (myasthenia gravis) and his prior medical leaves of absence. Indeed, the record reflects only that Temple supported Dr. Han's attempts to achieve tenure notwithstanding his health challenges. It granted Dr. Han two leaves of absence, extending his tenure clock twice. See SOF ¶ 46. This extension process exists to mitigate the effect of the disability or

medical leave on a tenure candidate without requiring him to disclose sensitive medical information to the reviewers.  See SOF Exhibit C: Anderson Tr. at 84:20-24; 85:1-7; 87:5-19.  In practical effect: although Dr. Han did not apply for tenure the first time until his eighth year with Temple, Temple evaluated his entire body of work as if he had accomplished everything by his sixth year.  Id.; see also SOF ¶ 14.  Each tenure applicant is held to the same standards of excellence outlined in the 2018 Guidelines, regardless of the number of leaves taken, so long as the candidate has six productive years to generate a body of work.  Id.  If Dr. Han felt that his disability continued to cause low productivity, he could have requested an additional leave.  He did not.  See SOF ¶ 20; see also SOF Exhibit C: Anderson Tr. at 148:19-24; 149:1-24; 150:1-15. In fact, he has never wavered from his contention that he has been fully able to work since mid-2018.  See SOF Exhibit A: Han Tr. at 106:8-19.

Although Dr. Han could have avoided disclosing his personal health information altogether, the record reflects that he chose to inform each level of tenure review of his medical condition.  See SOF ¶ 53.  After the first step in the tenure process during the 2019-2020 academic year, Dr. Han voluntarily added a "Medical Statement" to his portfolio that revealed his health struggles with myasthenia gravis and explained his two FMLA leaves.  See SOF ¶ 53. Dr. Han testified that he included this information because it provided "context" to his low productivity.  See SOF Exhibit A: Han Tr. at 103:8-24; 104:1-24; 105:1-24; 106:1-24; 107:1-20.[2]

Dr. Han has offered no evidence to show Temple denied him tenure either because he voluntarily made a record of his disability in his tenure packet, or due to the disability itself.  No

_____

[2] Dr. Han had a friend at Penn, Dr. Linda Zhao, who recommended that, because of his low productivity, he should let tenure reviewers know that he was ill but fully recovered by mid-2018.  See SOF Exhibit A: Han Tr. at 103:22-24; 104:1-24; 105:1-24; 106:1-19.

evidence exists that the members of the tenure-review process considered his medical disability as a reason to deny him tenure. If anything, the record reflects that the reviewers were ambivalent whether they should even know of his private medical issues and were wary of considering this information at all. See Exhibit 1: E-mails with Crystal Harold; see also SOF Exhibit C: Anderson Tr. at 84:20-24; 85:1-7; 87:5-19. Because Dr. Han has failed to make a showing sufficient to establish the essential elements of this claim, judgment should be entered as a matter of law.

### C.    Dr. Han Cannot Establish a *Prima Facie* Case for Retaliation or Interference

The record lacks evidence from which Dr. Han can establish a *prima facie* case for retaliation under the ADA or PHRA. To establish a *prima facie* case for retaliation under the ADA and PHRA, Dr. Han must establish that (1) he engaged in a protected activity, (2) he suffered an adverse employment action either after or contemporaneous with the protected activity, and (3) there was a causal connection between his participation in the protected activity and the adverse action. See Krouse, 126 F.3d at 500 (citing Woodson, 109 F.3d at 920).

The *prima facie* elements for retaliation under the FMLA require Dr. Han to establish that (1) he invoked his right to FMLA-qualifying leave, (2) he suffered an adverse employment action, and (3) a causal connection existed between the denial of tenure and Dr. Han's invocation of his FMLA rights. McIntosh, 249 F. Supp. 3d at 801.

#### 1.    Retaliation under the ADA and PHRA

Dr. Han made two separate claims of retaliation: (1) he alleged that Dean Anderson denied his tenure application because he requested an accommodation; and (2) when he raised complaints of disability discrimination, Temple denied his tenure application. The record does

not support the existence of a causal connection between either the request for an

accommodation or the complaint of discrimination and Temple's decision to deny him tenure.

### a) The Record Reflects that No Causal Connection Exists.

Absent record evidence of a causal connection between his complaints of discrimination

and the adverse employment action, Dr. Han cannot establish a case for retaliation. "The mere

fact that an adverse employment action occurs after a complaint will ordinarily be insufficient to

satisfy the plaintiff's burden of demonstrating a causal link between the two events." Krouse,

126 F.3d at 503 (citing Robinson v. City of Pittsburgh, 120 F. 3d 1286, 1302 (3d Cir. 1997)).

However, even if timing alone could be sufficient to establish a causal link, the timing would

need to be "unusually suggestive" of retaliatory motive before a causal link can be inferred.  Id.

Dr. Han has not adduced evidence to support any such link.

### (i) Request for an Accommodation

Considering the record, Dr. Han has failed to establish that a causal connection exists

between Temple's decision to deny tenure and Dr. Han's request for a teaching accommodation.

Notably, in August 2021, Dr. Han spoke with the Department's Senior Administrative Assistant,

Summer Page, and explained that he would *prefer* to teach his fall 2021 course online.  See SOF

¶¶ 69-70.  Temple denied this request due to its close proximity to the start of classes.  Dr. Han

did not contest the denial or make a formal request for an accommodation, or complain to the

administration; rather, Dr. Han taught his fall class in person.  Id.  Further, Dr. Han presented no

evidence to show that the Dean considered this request during the review process.  Therefore, no

genuine dispute of material fact exists to demonstrate that Dr. Han's request to teach virtually in

the fall of 2021 and the Dean's decision to deny tenure were anything other than utterly

disconnected.

**(ii)    Complaint to Sandra Foehl**

In a second attempt to bolster his unsupported retaliation claim, Dr. Han alleged that Temple denied him tenure because he contacted Temple's Equal Opportunity Compliance office ("EOC") following the Dean's recommendation against tenure.  The record undermines this allegation.  Dr. Han sent his first e-mail to Temple's EOC on January 18, 2022.  See Exhibit 2: E-mail to Sandra Foehl.  In this e-mail, Dr. Han stated that he believed the Dean and the Department representative, Dr. Alan Izenman, had been "playing discriminatory roles" in his case.  Id.  Unbeknownst (apparently) to Dr. Han, Dr. Izenman, a member of the Fox School Committee, made a recommendation *in favor of* tenure for Dr. Han.  See SOF ¶ 84.  In fact, Dr. Izenman vociferously advocated during the committee meetings and via email that Dr. Han should receive tenure.  Dr. Han had absolutely no basis for his allegations of discrimination either when he made his complaint or after the close of discovery.  Second, Dean Anderson finalized his letter recommending against tenure on January 12, 2022, prior to Dr. Han's complaint to the EOC.  See SOF ¶ 85 and SOF Exhibit F.  Therefore, Dean Anderson's recommendation against tenure, and the review at any level prior to the Dean, could not have been made in retaliation for Dr. Han's complaint to Sandra Foehl.

No facts exist to support Dr. Han's contention that the recommendations made against tenure *after* Dr. Han's complaint to the EOC, including those of the Provost, the President, and the Board of Trustees, were influenced by Dr. Han's complaint.  The tenure review process has a set timeline.  Rather than wait for the end of the tenure process to initiate a complaint to the EOC, Dr. Han made his complaint in the middle of the process.  Dr. Han has not demonstrated that any temporal proximity was anything more than a function of the pre-established tenure timeline.  Nothing in the record suggests that anyone in the Provost's Office, the University

15

Promotion and Tenure Committee, the President, or the Board of Trustees considered Dr. Han's complaint to Sandra Foehl while evaluating his tenure packet. To this point, other than Kevin Delaney (the Vice Provost for Faculty Affairs who had no vote in the process), no evidence exists that any other level of review even had notice that Dr. Han made complaints of discrimination to the EOC. The lack of an evidentiary support of causal connection between the complaint and decision to deny tenure is fatal to Dr. Han's claim.

(iii)    <strong>Complaint to the Provost</strong>

Dr. Han also alleged that he made a complaint of discrimination in an e-mail directly to the Provost, and subsequently received a recommendation against tenure from the Provost on March 30, 2022. <u>See</u> Amended Complaint ¶¶ 68-69. In his e-mail, Dr. Han complained that the Dean evaluated his case under improper guidelines and the Department representative (Alan Izenman) did not fairly present his case to the School Committee – *not that he faced discrimination*. The only mention of Dr. Han's medical condition is the statement, "As you know, I have suffered from a rare autoimmune disease called myasthenia gravis, which is classified as disability. Despite such enormous difficulties, my research has achieved Fox's 'outstanding' standard." <u>See</u> Exhibit 3: E-mail to Kevin Delaney (Jan. 20, 2022).

Dr. Han makes no mention of any alleged unlawful treatment by Temple due to his medical condition. Rather, his comment concerning his disability appeared intended to demonstrate what he accomplished despite suffering from myasthenia gravis. In fact, there is no evidence whatsoever in the record that Temple understood Dr. Han to be raising a complaint of disability discrimination. A complaint of discrimination must be made with sufficient specificity to put an employer on notice of the kind of discrimination being alleged. <u>Sanchez v. SunGard Availability Servs. LP.</u>, 362 F. App'x 283, 288 (3d Cir. 2010); <u>Curay-Cramer v. Ursuline Acad.</u>

16

of Wilmington, Del., Inc., 450 F.3d 130, 135 (3d Cir. 2006) (noting that a "general complaint of unfair treatment is insufficient to establish protected activity"); Barber, 68 F.3d at 701. Dr. Han's email to the Provost does not constitute protected activity because Dr. Han did not sufficiently put Temple on notice of specific complaints of discriminatory conduct. See Exhibit 3. Moreover, in his response, Dr. Delaney addressed only the application of the 2018 tenure guidelines and the external letter and Dr. Izenman's presentation to the Fox School Committee. See Exhibit 3. Dr. Delaney did not address possible claims of discrimination in his reply because Dr. Han did not specifically allege claims of discrimination. Id. Further, no evidence exists that the Provost ever considered this e-mail while making the tenure decision. Because no material facts exist in the record to demonstrate either that Temple understood the email to constitute a complaint of discrimination or that the Provost considered the email to Dr. Delaney in his tenure determination, Dr. Han cannot establish a causal connection between his complaints of discrimination and retaliatory action taken by Temple.

### 2.    Retaliation Under the FMLA

Dr. Han alleged Temple retaliated against him for taking FMLA leave. Again the record is devoid of any disputed material fact that could demonstrate a causal link between the protected activity and the adverse action. Without evidence sufficient to establish the essential elements of this claim, Dr. Han's retaliation claim fails as a matter of law. "The Third Circuit has articulated two factors relevant to the analysis of establishing the causal link between the adverse employment decision and the FMLA leave: (1) a showing that that the two events were close in time or (2) evidence of ongoing antagonism towards the employee." McIntosh, 249 F. Supp. 3d at 801. In McIntosh, the court dismissed plaintiff's FMLA retaliation claim because she was

unable to show that her change in employment status occurred in close temporal proximity to her FMLA leave or ongoing antagonism towards her disability.  Id.

Similarly, here, Dr. Han has failed to adduced any evidence in discovery from which a factfinder could reasonably conclude that a causal connection existed between the denial of tenure and his FMLA leaves.  In 2015, Dr. Han requested and received an approved leave under the Family Medical Leave Act for the fall semester (August 2015 to January 2016).  See SOF ¶ 17.  Dr. Han returned to work full-time in January 2016.  In the fall of 2016, Dr. Han sought and received a second approved leave pursuant to the FMLA for a medical condition.  See SOF ¶ 18. These were the only two instances in which Dr. Han requested FMLA leave, and both occurred several years before Dr. Han applied for tenure, and several years before any tenure recommendations or decisions.  See SOF ¶ 20.  It also is undisputed that, following his medical leave, Dr. Han's treating physician informed Temple that Dr. Han could return to teaching at full capacity with no restrictions.  See SOF ¶ 23.

Moreover, the record is silent on any alleged ongoing antagonism related to his disability that could demonstrate a causal connection between Temple's employment decision and Dr. Han's FMLA leaves.  In fact, Dr. Han testified that he felt supported by his colleagues and the administration during the times that he was out on leave.  See SOF ¶ 22.  For example, one of his colleagues, a member of the Department Committee, agreed to split up Dr. Han's lecture in 2017 to help accommodate his disability.  See SOF ¶ 25.  No factfinder could not conclude that Dr. Han can establish a *prima facie* case.

### 3.    Interference Under the FMLA

Lastly, Dr. Han argued that Temple somehow planned to interfere with his right to take FMLA leave at some undetermined time in the future.  However, nothing in the record to

establishes a *prima facie* case for FMLA interference.  This claim requires Dr. Han to prove that (1) he was an eligible employee under FMLA, (2) Temple was subject to the FMLA's requirements, (3) he was entitled to FMLA leave, (4) he gave notice to Temple of his intention to take FMLA leave, and (5) he was denied benefits to which he was entitled to under the FMLA. Head v. City of Philadelphia, 627 F. Supp. 3d 444, 447 (E.D. Pa. 2022).  Dr. Han cannot make a showing sufficient to support the third and fourth elements of his claim primarily because he never requested another FMLA leave after he returned from FMLA leave in 2017.  See SOF ¶ 20.

For an interference claim, courts require an employee to show that they are not only entitled to FMLA benefits, but also that they were denied those benefits.  See Sommer v. The Vanguard Grp., 461 F.3d 397, 399 (3d Cir. 2006) (citing Callison v. City of Philadelphia, 430 F.3d 117, 119 (3d Cir. 2005)).  "An interference claim is not about discrimination [;] it is only about whether the employer provided the employee with the entitlements guaranteed by the FMLA."  Ross v. Gilhuly, 755 F.3d 185, 192 (3d Cir. 2014) (citing Callison, 430 F.3d at 120). Dr. Han does not (and cannot) allege that Temple actually withheld his entitlement to FMLA because it did not.  While employed with Temple, Dr. Han requested two FMLA leaves, both of which Temple granted without objection.  See SOF ¶¶ 17-19.  Thus, judgment should be entered as a matter of law.

### D.    The Record Reflects that Temple's Legitimate, Non-Discriminatory Reasons for Denying Dr. Han Tenure Were Not Pretextual

#### 1.    The Facts Show that Temple Denied Dr. Han Tenure for Legitimate, Non-Discriminatory Reasons

Assuming, *arguendo*, that Dr. Han was able to make a showing sufficient to establish a *prima facie* case on any of his discrimination or retaliation claims, the McDonnell Douglas standard shifts the burden of production to Temple to articulate a legitimate, non-discriminatory

reason for denying tenure.  411 U.S. at 792.  Temple easily meets that burden of production.  The 2018 Guidelines provided the expectations to attain tenure, including "outstanding" research and teaching, and "acceptable" service to the school community.  See SOF Exhibit I at 1.  The letters evaluating Dr. Han's tenure application did not criticize his teaching or service; he was deemed a good teacher and met "the threshold of acceptability in terms of service." See SOF Exhibit F at 2.  Rather, the recommendations focused on the requirements to achieve "outstanding" research; four publications in "A" journals, research grants, and solo-authored papers.  See SOF ¶ 28; SOF Exhibit F; and SOF Exhibit I at 1-2.  The 2018 Guidelines set forth a minimum standard for tenure, and Dr. Han did not meet it.  See SOF ¶ 58.  During the 2019-2020 tenure cycle, Dr. Han had only three publications in "A" journals.  See SOF ¶ 58.  Not only did Dr. Han fail to publish four "A" papers, he also failed to obtain any external funding for his research.  See SOF ¶ 58.  These facts are undisputed.  These factors led Dr. Han to fall short of the requirements.  Id.  Dean Anderson described Dr. Han in the 2019-2020 academic year as a "bubble candidate."  Id.  He believed that Dr. Han was close to meeting the standard for tenure, but needed more, such as another "A" paper, to push him towards a successful tenure application.  Id.

After an unsuccessful experience applying for tenure the first time, Dr. Han expected a different outcome while offering the same achievements in his second application.  When Dr. Han applied for tenure in the 2021-2022 academic year, he had no new publications in "A" journals and no research grants.  See SOF ¶ 77.  These facts, too, are undisputed.  Thus, and unsurprisingly, Dr. Han achieved the same result.  Because Dr. Han's second application failed

20

to demonstrate the excellence necessary to be deserving of a lifetime appointment, Temple denied Dr. Han tenure for legitimate, non-discriminatory reasons.[3]

### 2.    Dr. Han is Unable to Establish Pretext Based on the Record.

Once Temple establishes its legitimate, non-discriminatory reasons for the action, to survive summary judgment, Dr. Han must make a showing sufficient to demonstrate that Temple's reason is pretext. McDonnell Douglas Corp., 411 U.S. at 792. To do so, Dr. Han must point to enough evidence in the record that, taken together, demonstrates that the alleged discrimination was a "but for" cause of the employment decision. Fuentes, 32 F.3d at 764 (citing Hazen Paper Co. v. Biggins, 507 U.S.604, 610 (1993)).

### 3.    Disagreement With The Tenure Decision Does Not Establish Pretext

The evidence offered for a reasonable jury to disbelieve Temple's legitimate, non-discriminatory reasons must be more than an incorrect decision or a mistake on the part of the tenure reviewers; rather, it must demonstrate, by a preponderance of the evidence, that "such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence' and hence infer the employer was not actually motivated by its proffered nondiscriminatory reason." Parker, 309 Fed. App'x. at 556-57 (citing Fuentes, 32 F.3d at 765).

The Third Circuit has historically been wary of second-guessing the decisions of a university in tenure decisions, holding that the primary responsibility for judging candidates remains with the university, and the courts "must be vigilant not to intrude into that determination [of whether to grant tenure], and should not substitute their judgment for that of

---

[3] The same criticisms of Dr. Han's tenure packet existed during his first tenure application in 2019, and remained consistent with each level of review during his second application.

the college with respect to the qualifications of faculty members for promotion and tenure." <u>See</u> <u>Kunda v. Muhlenberg Coll.</u>, 621 F.2d 532, 548 (3d Cir. 1980). In <u>Molthan</u>, this Court held that more than denial of tenure as a result of dispute over qualifications must be shown to prove the legitimate, non-discriminatory reason was pretextual. 778 F.2d 955, 962 (3d Cir. 1985).

Dr. Han argues that his solo-authored paper in an "A" journal was sufficient to overcome the unsatisfactory quantity of publications in top-tier journals. <u>See</u> SOF ¶ 49. While the 2018 Guidelines recognize the merit of a solo-authored paper, they do not propose that a solo-authored paper should count as two "A" publications. <u>See</u> SOF Exhibit I at 1-2. Each level of review recognized the merit of the solo-authored paper. However, Temple ultimately decided this one paper did not carry enough weight to overcome the insufficient quantity of top-tier publications and the lack of research grants. Arguing over the bare minimum requirement is not pretext.

### a) Multiple Levels Of Review Found Dr. Han's Tenure Application Was Not Strong Enough To Grant Tenure

Even if Dr. Han disagrees with the findings of the faculty members reviewing his tenure case, he cannot point to any evidence showing discriminatory intent at any level of review. In <u>Molthan</u>, the court held that the defendant produced a legitimate, non-discriminatory reason for denying tenure where the majority of those who voted on tenure believed the plaintiff was not qualified. 778 F.2d at 962. The undisputed facts demonstrate that the tenure-review process at Temple lasts almost a full academic year, from the creation of the packet in or around July until the Board of Trustees's decision the following May. The tenure decision is not the decision of one set of people. Temple requires the input of over 25 individuals, accounting for each stage, to review the tenure application and provide feedback. <u>See</u> SOF ¶¶ 35-43. No one can legitimately dispute that this extensive review process is designed to curate multiple opinions concerning whether the applicant has attained the level of excellence required for a lifetime appointment.

During both of Dr. Han's tenure applications, several levels of review determined that Dr. Han's application was insufficient.  During the first tenure application, several external reviewers penned unfavorable letters, and Dr. Han's own Department did not recommend tenure.  <u>See</u> SOF ¶¶ 54, 58.  The Fox School Committee initially voted against tenure, until Dr. Han presented his case in person, leading to a 7-2 vote in favor of recommending tenure.  <u>See</u> SOF ¶ 56.  Multiple reviewers were concerned by Dr. Han's lack of productivity and low number of publications.  <u>See</u> SOF ¶¶ 55-56.  After careful consideration, the Dean ultimately determined that Dr. Han was not qualified for tenure. <u>See</u> SOF ¶ 58.

Dr. Han applied for tenure again during the 2021-2022 academic year, following a year-long extension due to COVID.  Dr. Han once again presented only three "A" publications, and no external research funding.  <u>See</u> SOF ¶¶ 77, 80.  While Dr. Han received more favorable responses from the external reviewers in his second tenure application and a favorable recommendation from the Department Committee, the Department Committee still acknowledged his "sub-par quantity" of publications.  <u>See</u> SOF ¶ 80.  The Fox School Committee participated in a close vote, with five members in favor of granting tenure, and four in favor of denying tenure. <u>See</u> SOF ¶ 83.  Once again, reviewers expressed concern about Dr. Han's productivity and publications.  <u>Id.</u> at ¶¶80, 83-85.  No level of review, except Dr. Han's own Department Chair, expressed overwhelming positivity or confidence in Dr. Han's application.  All of these facts are undisputed.

The outcome should have never been a surprise to Dr. Han.  Temple informed Dr. Han years before his first tenure application that he needed to increase his research and publications.  <u>See</u> SOF ¶ 16.  All tenure tenure-track professor are reviewed in their third year of employment to ascertain whether they are on track for tenure.  <u>See</u> SOF ¶ 15.  This review is accompanied by

a reappointment letter, which Dr. Han received on March 6, 2015.  See SOF ¶ 16.  The letter

stated that Dr. Han had "previously been advised during this review process of concerns about

your performance."  Id.  This letter conveyed the Provost's recommendation that Dr. Han seek

research funding for a satisfactory tenure review and advised him to "pay close attention" to the

"recommendations made by your Dean… encouraging you to continue your progress in your

research for a satisfactory tenure review." Id.  The Dean who made this evaluation of Dr. Han's

tenure progress *preceded* Dean Anderson.  Dean Anderson did not become interim Dean of the

Fox School until 2018.  See SOF Exhibit C: Anderson Tr. at 44:18-21.  This letter is evidence

that concerns regarding Dr. Han's productivity and performance existed *prior* to Dean Anderson.

Concern that Dr. Han would fall short of Temple's standards for tenure was raised before Dr.

Han applied for tenure, before he took either FMLA leave, and before he requested any

accommodations.  Id.

> **b)    Alleged Procedural Irregularities In The Process Lack Evidence Of Discrimination**

Without a legitimate basis, Dr. Han has argued that "procedural irregularities" in his

tenure review process demonstrate pretext.  Dr. Han, for instance, contended that Dean Anderson

applied the wrong tenure guidelines to Dr. Han's application during the 2021-2022 review.  That

charge is simply indisputably untrue. When he reapplied for tenure in 2021, Temple had

instituted the 2020 Guidelines.  However, Dr. Han requested review under the 2018 Guidelines

rather than the 2020 Guidelines.  See SOF ¶¶ 74-75.  Kevin Delaney, the Vice Provost for

Faculty Affairs, communicated this decision to the Dean and confirmed in January 2022 that the

Dean used the 2018 Guidelines while evaluating Dr. Han's application. Id.; see also Exhibit 3.

Dean Anderson communicated to Dr. Delaney that he thought that Dr. Han would fare better

under the new 2020 Guidelines.  Id.  However, no doubt exists that Dean Anderson abided by

24

Dr. Han's request and confirmed he used the 2018 Guidelines.  <u>See</u> SOF ¶ 75 and SOF Exhibit Z.

In <u>Howell v. Millersville Univ. of Pa.</u>, the court found that the plaintiff failed to prove pretext through evidence that the school applied the wrong tenure standards where there was no evidence that the school did so deliberately because of his age.  283 F. Supp. 3d 309, 328 (E.D. Pa. 2017).  Further, the court in <u>Laverty v. Drexel Univ.</u> held that even where mistakes and errors occurred in violation of a policy, it is not enough to persuade the court that defendant's legitimate, non-discriminatory reason was not the genuine reason for the adverse employment action. 2016 U.S. Dist. LEXIS 6909, at *23 (E.D. Pa. Jan. 21, 2016).

Even if Dr. Han were able to demonstrate facts sufficient to evidence that Dean Anderson applied the wrong policies while evaluating his case, he cannot demonstrate facts sufficient to defeat Temple's legitimate, non-discriminatory reasons for denying tenure.  Even if errors were made, the evidence is in no way even suggestive that the mistakes or errors were based on Dr. Han's gender, age, national origin, race, or disability.  Because no genuine issue as to any material fact exists that would bar the dismissal of these claims, the Court should grant summary judgment.

## IV.    CONCLUSION

For the foregoing reasons, Temple respectfully requests that the Court grant summary judgment in its favor and enter judgment in its favor on all of Dr. Han's claims.

Respectfully Submitted,

_____

25