**IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF EASTERN PENNSYLVANIA**

| | |
|---|---|
| XU HAN <br><br> Plaintiff, <br><br> v. <br><br> TEMPLE UNIVERSITY <br><br> Defendant. | CIVIL ACTION NO: 2:23-cv-04433 |

**RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT**

**TABLE OF CONTENTS**

I.    INTRODUCTION ............................................................................................ 1

II.   FACTUAL BACKGROUND ........................................................................... 1

  A.  Dr Han's Academic Career and Medical Challenges........................................ 1

  B.  Temple's Tenure Process and Guidelines.......................................................... 2

  C.  Dr. Han's First Tenure Application (2019-2020) ............................................. 2

  D.  Dr. Han's Second Tenure Application (2021-2022).......................................... 4

III.  LEGAL ARGUMENT ..................................................................................... 6

  A.  LEGAL STANDARD ....................................................................................... 6

  B.  THE *MCDONNELL DOUGLAS* STANDARD APPLIES TO PLAINTIFF'S CLAIM. ..... 6

  C.  DEFENDANT IS LIABLE UNDER A "CAT'S PAW" THEORY BASED ON THE DISCRIMINATORY AND RETALIATORY INTENT OF DEAN RONALD ANDERSON AND ASSISTANT DEAN AUBREY KENT. ................................................................. 8

  D.  PLAINTIFF HAS ESTABLISHED A *PRIMA FACIE* CASE OF DISABILITY DISCRIMINATION AND CAN ESTABLISH DEFENDANT'S PURPORTED NON-DISCRIMINATORY REASON FOR THE DECISION IS PRETEXTUAL. ........................... 9

    1.  Plaintiff has demonstrated unusually suggestive timing and hostility towards his disability between his January 3, 2022 request for a remote teaching accommodation related to his disability and the Dean's January 14 Tenure Denial Recommendation. ..................... 11

    2.  Additional Evidence of a Causal Link between Plaintiff's Disability and Dean Anderson's 2021 Tenure Denial Recommendation Exists. ................................................... 13

    3.  Plaintiff can also establish Defendant's purported reasons for denying tenure are pretextual, which also establishes causation. .......................................................... 17

  E.  DEFENDANT'S MOTION SHOULD ALSO BE DENIED AS TO PLAINTIFF'S ADA AND PHRA RETALIATION CLAIMS FOR REQUESTING A REASONABLE ACCOMMODATION................................................................................................. 21

  F.  PLAINTIFF HAS ESTABLISHED A PRIMA FACIE CASE OF RETALIATION FOR COMPLAINING ABOUT DISABILITY DISCRIMINATION. ............................................. 22

  G.  PLAINTIFF HAS ESTABLISHED A PRIMA FACIE CASE FOR FMLA RETALIATION-FOR-EXERCISE AND INTERFERENCE ................................................................. 23

    1.  FMLA Retaliation-for-Exercise ..................................................................... 23

    2.  FMLA Interference Related to Future Leave ...................................................... 24

  H.  PLAINTIFF HAS ESTABLISHED *PRIMA FACIE* CASES OF RACE, NATIONAL ORIGIN, AND RACE-PLUS-GENDER DISCRIMINATION. ............................................. 25

IV.   CONCLUSION................................................................................................ 28

I. **<u>INTRODUCTION</u>**

Temple University's motion for summary judgment should be denied because substantial evidence suggests Dr. Han's tenure denial was motivated by discrimination and retaliation. The record contains direct evidence of hostility toward Dr. Han's medical condition, including Assistant Dean Kent's characterization of Han's disability accommodation request as "medical shit" days before the critical tenure recommendation. Key decision-makers actively prevented Han from discussing his disability with tenure reviewers, changed long-standing procedures after his disability disclosure resulted in favorable committee votes, and improperly counted his disability leave against him when evaluating his publication record.

Despite strong recommendations from external reviewers, his department chair, and review committees, Dr. Han—a Chinese American male with a serious autoimmune condition—was denied tenure based on purportedly insufficient publications. Yet the record shows Dean Anderson recommended tenure for non-disabled candidates with fewer publications and ignored Han's achievement of a fourth top-tier publication—the very criterion Anderson claimed was necessary. These procedural irregularities, inconsistent standards, and shifting rationales provide compelling evidence of pretext under the McDonnell Douglas framework, creating genuine issues of material fact that require resolution by a jury.

II. **<u>FACTUAL BACKGROUND</u>**

**A. Dr Han's Academic Career and Medical Challenges**

Dr. Xu Han is a Chinese male statistician who joined Temple University's Fox School of Business in July 2012 as a tenure-track Assistant Professor. JSF ¶¶ 9-10. He holds a PhD in Statistics from the University of Pennsylvania and previously taught at Princeton, with research

focusing on advanced statistical methodologies published in prestigious journals. JSF ¶ 5; Ex. DD at 3; Ex. G at 3-4.

Dr. Han took two FMLA leaves: August 2015 to January 2016 for his daughter's birth, and August 2016 to January 2017 due to myasthenia gravis, a serious autoimmune disorder that affected his productivity until approximately Spring 2018. JSF ¶¶ 17-19, 23; PSAF ¶¶ 2-7. His condition remains chronic and potentially life-threatening, especially when exposed to infections like COVID-19. PSAF ¶¶ 65-66; Ex. X at Temple-66.

### B.  Temple's Tenure Process and Guidelines

Temple's tenure process involves multiple levels of review: (1) external reviewers, (2) department committee, (3) department chair, (4) school committee, (5) dean, (6) university committee, (7) provost, (8) president, and (9) board of trustees. JSF ¶¶ 33-42. The standard required candidates to be "outstanding" at research and teaching, and "satisfactory" at service. JSF ¶¶ 27, 30.

While under the 2018 guidelines, "outstanding" scholarship could be demonstrated by publishing at least four articles in top ("A") journals, with additional publications preferably in "A-*" and "A-" journals. JSF ¶ 28. The guidelines emphasized these metrics were recommendations, not rigid requirements. Solo-authored papers were valued more highly than co-authored works, and seminal papers could count for more than one publication. JSF ¶ 29; Ex. I at 5.

### C.  Dr. Han's First Tenure Application (2019-2020)

Dr. Han's tenure process was marked by procedural irregularities and evidence of discrimination, particularly related to his disability and medical accommodations. For instance, when reviewers questioned gaps in Dr. Han's publication record, Department Chair Sarkar asked Associate Dean Kent whether he could share information about Dr. Han's medical leave. Kent

2

instructed Sarkar not to offer this information, and to only say "one year shouldn't count" if specifically asked. PSAF ¶¶ 10-14.

When Dr. Han asked to present his "personal situations" to the department committee, Kent denied his request as "inappropriate." PSAF ¶ 16. Kent later expressed concern to the School Committee chair about Han's potential "inappropriate personal appeals." PSAF ¶ 23.

Despite these obstacles, when Dr. Han and Dr. Sarkar eventually presented to the School Committee, explaining his medical condition, the committee reversed its preliminary 5-4 vote against tenure to a 7-2 vote in favor. JSF ¶ 56; PSAF ¶¶ 24, 29-31. Following this reversal, Kent prohibited all candidates from meeting with committees—changing a longstanding practice specifically after it had benefited Dr. Han. PSAF ¶ 25.

Despite positive recommendations from the Department Chair and School Committee, Dean Anderson recommended against tenure. JSF ¶¶ 58-59; Ex. G. His letter criticized Han's "productivity" over his entire eight-year employment period—including his disability-related leave. JSF ¶ 14; Ex. G at 2.

Anderson's private communications revealed different motivations than his official letter, describing Han as a "bubble case" where he "could go either way," but leaning toward rejection because "the school will not lose anything" and "we can do better on the open market." JSF ¶ 58; Ex. Q. Anderson admitted he would likely vote for tenure if the department committee had supported it. Id.

The University Committee voted 3-2 in favor of recommending tenure after hearing from Dr. Sarkar about Dr. Han's medical condition. JSF at ¶ 59, Response; PSAF at ¶ 32. However, Provost Epps, after consulting with Dean Anderson, recommended against tenure. PSAF at ¶¶ 34-

35. Dr. Han ultimately withdrew his application on the advice of Assistant Provost Kevin Delaney, allowing him to reapply the following year using the 2018 standards. JSF at ¶¶ 61-63, 73-74.

During this period, Temple administrators discussed replacing Dr. Han with candidates they considered more diverse. Emails show they were considering Hedibert Lopes, described as "a Brazilian-born U.S. citizen of African-American descent" specifically because "Xu Han is leaving us." PSAF ¶¶ 37, 39; Ex. YY at Temple 011504; Ex. ZZ at Temple 02226-2227. Anderson testified that Temple was trying to hire more "diverse" faculty, defining diversity as women and minorities, while not considering Asians a minority and instead categorizing them as "white." PSAF ¶¶ 43-44, 46, 50.

In June 2020, Dr. Han submitted medical documentation explaining that his condition put him at high risk from COVID-19. JSF ¶ 65; Ex. X. While Temple allowed remote teaching in Fall 2020 and Spring 2021 due to university-wide policies, Dr. Han's August 2021 request to continue teaching remotely was denied without explanation. JSF ¶¶ 67-69; Ex. Y at 2.

On January 3, 2022, Dr. Han again inquired about teaching remotely due to his high-risk status. PSAF ¶ 103. In response, Kent told his team that if Han was scheduled for in-person classes, then his "medical shit doesn't matter, since he hasn't done the appropriate paperwork to be virtual." PSAF ¶ 103; Ex. KKJK at 2.

### D.  Dr. Han's Second Tenure Application (2021-2022)

In Dr. Han's second application, external reviewers had access to his medical statement and provided highly positive reviews. JSF at ¶ 78; Ex. OO, ECF Doc. No. 38-42; Ex. BB, ECF Doc. No. 38-29, at 3. His Department Committee unanimously endorsed his application, noting that while he fell "a little short of the quantitative requirement," the high quality of his publications

4

demonstrated outstanding research. JSF at ¶ 79; Ex. BB, ECF Doc. No. 38-29, at 2-3. Dr. Sarkar again recommended Dr. Han receive tenure. JSF at ¶ 82.

The School Committee voted 5-4 to recommend tenure, but the process was marred by procedural irregularities. A severe argument erupted between Professors Izenman (who supported Dr. Han) and Thatcher about whether to include minority opinions criticizing Han's publication quantity. PSAF ¶¶ 57-58. When Professor Izenman suggested mentioning Dr. Han's medical issues, others objected, with Professor Thatcher explicitly mentioning concerns about "lawsuits over tenure," "being deposed," and creating "path dependencies" for future cases. PSAF ¶ 65.

Kent began drafting Dean Anderson's letter on January 4, 2022, the day after referring to Dr. Han's accommodation request as "medical shit." PSAF ¶¶ 72, 103. The draft falsely claimed external reviewers noted "a slow pace and irregular consistency" in Dr. Han's publications—a claim the University Committee later determined could not be found in any reviewer letters. PSAF ¶¶ 73, 80; JSF ¶ 14; Ex. F at Temple-015331; Ex. FF at Temple 009809; Ex. OO.

When reviewing an early draft, Anderson worried it was "too positive" because it acknowledged Han's "very, very high quality" research, and modified it to be more negative. PSAF ¶¶ 74-77. Most significantly, Anderson's stated reason for denial was that Han needed "one more top quality publication," Additional Excerpts of Anderson's Deposition, attached hereto as Exhibit 1 at 119:11-20; 177:10-19, yet he ignored Han's new paper in the Journal of Business and Economic Statistics (JBES). On December 15, 2021, Han had informed Anderson about this paper being under final revision, PSAF ¶ 66, and later notified Kent of its acceptance shortly before Dean's recommendation was transmitted. PSAF ¶ 104.

After receiving Dean Anderson's negative recommendation, Dr. Han filed a discrimination complaint on January 18, 2022, and sent a written complaint to the Provost on January 20. JSF ¶

5

14. When Assistant Provost Delaney investigated, he relied on Kent, who misrepresented his role and falsely told Delaney that Han had only two "A" papers. PSAF ¶¶ 91, 97.

The University Committee subsequently voted unanimously against tenure. JSF ¶ 87. Provost Mandel spoke directly with Dean Anderson before making his decision, PSAF ¶ 82—despite Anderson later testifying such conversations were improper. PSAF ¶ 83. Following the pattern of rubber-stamping previous negative recommendations, the President and Board of Trustees denied tenure, resulting in Dr. Han's termination. JSF ¶¶ 90-93. Finally, Temple failed to preserve relevant evidence in response to Han's discrimination complaints, not implementing a litigation hold even after he filed an EEOC charge in November 2022. PSAF ¶¶ 110-112.

### III.    LEGAL ARGUMENT

#### A.    LEGAL STANDARD

Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Courts must "view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the motion.'" *Scott v. Harris,* 550 U.S. 372, 378 (2007).

#### B.    THE *MCDONNELL DOUGLAS* STANDARD APPLIES TO PLAINTIFF'S CLAIM.

Plaintiff's claims of discrimination and retaliation under the ADA, PHRA, Title VII, Section 1981, ADEA, and FMLA are all governed by variations of the McDonnell Douglas burden-shifting framework. *Atkinson v. LaFayette Coll.,* 460 F.3d 447, 454 n.6 (3d Cir. 2006); *Shellenberger v. Summit Bancorp, Inc.,* 318 F.3d 183, 187 (3d Cir. 2003); *Lichtenstein v. Univ. of Pittsburgh Med. Ctr.,* 691 F.3d 294, 302 (3d Cir. 2012); *Canada v. Samuel Grossi & Sons, Inc.,* 49 F.4th 340, 346 (3d Cir. 2022).

Under this framework, a plaintiff must first establish a *prima facie* case of discrimination or retaliation, a burden that is not intended to be onerous. *Sempier v. Johnson & Higgins,* 45 F.3d 724, 728 (3d Cir. 1995). To establish a *prima facie* case of discrimination, the plaintiff must show (1) membership in a protected class; (2) qualification for the position; (3) an adverse employment action; and (4) circumstances giving rise to an inference of discrimination. *Jones v. Se. Pa. Transp. Auth.,* 796 F.3d 323, 327 (3d Cir. 2015). To establish a *prima facie* case of retaliation, 1) protected employee activity; (2) adverse action; and (3) a causal connection between them. *Canada,* 49 F.4th at 346. Causation may be shown through (1) unusually suggestive temporal proximity, or (2) a pattern of antagonism coupled with timing. *Budhun v. Reading Hosp. & Med. Ctr.,* 765 F.3d 245, 258 (3d Cir. 2014).

If the employee establishes a prima facie case, the employer must articulate a legitimate, non-discriminatory reason for its action (a burden of production only, not persuasion. If the employer articulates a legitimate reason, the employee must proffer evidence that the employer's reason is false or pretextual. *Canada,* 49 F.4th at 347. Pretext is shown and summary judgment is improper if there is evidence where a factfinder could either (1) disbelieve the employer's articulated reasons; or (2) believe that discrimination was more likely than not a motivating cause of the employer's action. *Canada,* 49 F.4th at 347. This can be accomplished by showing the employer's reasons are "weak, implausible, contradictory, or incoherent," by demonstrating past discriminatory treatment, or by showing more favorable treatment of similarly situated persons outside the protected class. *Id.*

**C. DEFENDANT IS LIABLE UNDER A "CAT'S PAW" THEORY BASED ON THE DISCRIMINATORY AND RETALIATORY INTENT OF DEAN RONALD ANDERSON AND ASSISTANT DEAN AUBREY KENT.**

Temple's multi-level tenure review process does not insulate it from liability. Under the "cat's paw" theory, "an employer may be held liable when the discriminatory animus of a third party... becomes the de facto decision of the employer." *Staub v. Proctor Hospital,* 562 U.S. 411 (2011); *McKenna v. City of Philadelphia,* 649 F.3d 171, 177-78 (3d Cir. 2011).

The evidence demonstrates that Dean Anderson's negative recommendations were the proximate cause of Dr. Han's tenure denial. The record shows a clear pattern of deference to Anderson's judgment throughout the tenure process. The President and Board of Trustees overwhelmingly followed the recommendations of the Provost and Dean when they were in agreement (JSF ¶ 42-Responses). In 2020, Provost Epps explicitly stated she "supports the dean" after consulting with Anderson about Han's case (PSAF ¶ 35). Similarly, in 2021, Provost Mandel only decided to vote against Han's tenure after meeting with Anderson (PSAF ¶ 82). Anderson himself acknowledged this influence, testifying that the provost "tries to support the dean in the dean's decision" (PSAF ¶ 83). This evidence establishes that Anderson operated as the determinative decision-maker whose recommendations effectively dictated the final outcome.

The record further demonstrates that Associate Dean Kent's discriminatory and retaliatory animus influenced Anderson's decisions. Anderson testified that Han was a "bubble candidate" in 2020 who "could go either way" (Ex. Q), suggesting he was susceptible to Kent's input. Kent demonstrated clear animosity toward Han's disability and need for accommodations, describing Han's disability accommodation request as "medical shit" while drafting Anderson's letter (PSAF ¶ 103). Kent's influence on Anderson is evident in multiple instances: criticizing Han's disability-related low teaching load (PSAF ¶ 94); characterizing Han's 2020 application as "the weakest case"

(PSAF ¶ 99); failing to alert Anderson about Han's new top journal publication (PSAF ¶ 104); dismissing Han's procedural complaints as "saying a lot of things to the Provost to try to get a positive vote" (PSAF ¶ 107); and expressing hope that Han would be denied tenure (PSAF ¶ 108). Given Kent's central role in drafting Anderson's recommendation letters and Anderson's reliance on Kent's input, Kent's discriminatory intent is directly attributable to Temple's adverse actions.

The jury could reasonably conclude either that Anderson was Kent's "cat's paw," or that Kent's actions reflected Anderson's views as Kent's superior. In either case, if Plaintiff demonstrates that Anderson and/or Kent harbored discriminatory or retaliatory intent, Temple can be held liable for the resulting adverse action, regardless of the subsequent layers of review.

### D. PLAINTIFF HAS ESTABLISHED A *PRIMA FACIE* CASE OF DISABILITY DISCRIMINATION AND CAN ESTABLISH DEFENDANT'S PURPORTED NON-DISCRIMINATORY REASON FOR THE DECISION IS PRETEXTUAL.

Defendant seeks summary judgment as to Plaintiff's ADA and PHRA disability discrimination claims by arguing that Plaintiff cannot establish the third element of his *prima facie* case, i.e., "he cannot point to disputed material facts in the record to support an inference of discrimination," and, even if Plaintiff could establish a *prima facie* case, Plaintiff could not demonstrate that Defendant's purported legitimate reason for denying Plaintiff tenure is pretextual.

Defendant is incorrect as to Plaintiff's *prima facie* case, because (a) unusually suggestive timing exists between Plaintiff's requests for and discussions of potential disability accommodations with the determinative adverse action in this case, the Dean's negative 2022 recommendation, and (b) there is a pattern of antagonism in the form of discriminatory and adverse statements related to his disability and requests for accommodation by relevant decision-makers, and (c) the evidence as a whole supports an inference of discrimination. As for the pretext element,

the same evidence which supports causation supports finding pretext, as well as additional implausibilities and inconsistencies which allow the jury to disbelieve Defendant's purported reason for denying tenure is true.

To establish a prima facie case of disability discrimination, a plaintiff must establish that he (1) has a 'disability,' (2) is a 'qualified individual,' and (3) has suffered an adverse employment action because of that disability." *McNelis v. Pa. Power & Light Co.*, 867 F.3d 411, 414 (3d Cir. 2017).

There is a broad array of evidence that can establish the causal link. *Marra v. Phila. Housing Auth.*, 497 F.3d 286, 302 (3d Cir. 2007). This evidence can include temporal proximity between when an employer learns about the disability or discusses accommodations for the disability, *Tirk v. Dubrook, Inc.,* 673 F. App'x 238, 241 (3d Cir. 2016), or a pattern of antagonism such as discriminatory statements by supervisors, *Kairys v. S. Pines Trucking, Inc.,* No. 2:19-CV-1031-NR, 2021 U.S. Dist. LEXIS 97600, at *14 (W.D. Pa. May 24, 2021), or simply the evidence gleaned from the record as a whole. " *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 281 (3d Cir. 2000). As noted above, the only factor Defendant disputes in its motion is causal element, that the adverse action occurred because Plaintiff was disabled.

Notably, the same evidence Plaintiff uses to establish causation can also be used to establish pretext, and vice versa. *See Farrell v. Planters Lifesavers Co.,* 206 F.3d 271, 286 (3d Cir. 2000). At the final state of the *McDonnell Douglas* analysis, a plaintiff defeats summary judgment if he can "point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Canada,* 49 F.4th at 347. An employee can satisfy this test in different ways:

by "painting the [employer's articulated reasons] as weak, implausible, contradictory, or incoherent, . . .by showing that the employer in the past had subjected [the employee] to unlawful discriminatory treatment, [or by showing] that the employer treated other, similarly situated persons not of his protected class more favorably." *Id.*

### 1. Plaintiff has demonstrated unusually suggestive timing and hostility towards his disability between his January 3, 2022 request for a remote teaching accommodation related to his disability and the Dean's January 14 Tenure Denial Recommendation.

The Court should deny Defendant's summary judgment as to Plaintiff's disability discrimination claims because Plaintiff can show both unusually suggestive timing between his request for a disability accommodation, and specific hostility and antagonism towards that request during the critical period in which Dean Anderson recommended Plaintiff be denied tenure. This link provides the causal connection between Plaintiff's disability and the adverse action sufficient to warrant denial of summary judgment.

A causal connection based on temporal proximity can be inferred from either "unusually suggestive temporal proximity between the protected activity and the alleged retaliatory action, or a pattern of antagonism coupled with timing to establish a causal link." *Budhun v. Reading Hosp. & Med. Ctr.,* 765 F.3d 245, 258 (3d Cir. 2014). A temporal proximity of a week or less qualifies as unusually suggestive timing. *Id.* The causal link is between the protected activity and the **decision** that causes the adverse action, even if the adverse action itself does not become effective until a later date. *Id.* While the inference of causation stemming from temporal proximity most commonly appears in the context of retaliation claims, it also applies to the disability discrimination context wherein the inciting incident is alerting the employer to the disability or requesting an accommodation. *Tirk v. Dubrook, Inc.,* 673 F. App'x 238, 241 (3d Cir. 2016)

11

On January 3, 2022, On January 3, 2022, Plaintiff inquired as to whether his Spring 2022 class would meet virtually and relayed that he was concerned because his autoimmune disease made him high-risk for a COVID infection. PSAF at ¶ 103. Kent responded the same day telling his team "if [Plaintiff] was scheduled for in person, then his **medical shit** doesn't matter, since he hasn't done the appropriate paperwork to be virtual." PSAF at ¶ 103; Ex. KKJK, ECF Doc. No. 38-88, at 2.

The next day, Kent began working on Dean Anderson's 2022 Letter, and Kent sent Anderson a first draft on January 6 which misrepresented the consensus of Han's 2021 external reviewers by falsely stating they noted "a slow pace and irregular consistency to Dr. Han's publications." On January 7, Anderson provided revisions to that letter in a new draft that Anderson "feared was too positive" because it acknowledged the "very, very high quality" of Plaintiff's research but nevertheless expressed Anderson's recommendation that Plaintiff be denied tenure. *See* PSAF at ¶¶ 38, 62; *see* Ex. III, ECF Doc. No. 38-62.

Anderson confirmed in his deposition that he was aware Plaintiff had made these inquiries regarding remote teaching accommodations, PSAF at ¶ 64, and Anderson testified he believed it was difficult for Fox to operate on a "remote teaching" model because of less student engagement and more student cheating. PSAF at ¶ 36.

On January 14, 2022, the Dean's office transmitted Dean Anderson's letter dated January 12 recommending Plaintiff be denied tenure. JSF at ¶ 85; PSAF at ¶¶ 104, 104-Response, 105; Ex. F, ECF Doc. No. 38-7; Ex. NNNN, ECF Doc. No. 38-91, at 2.

Accordingly, only three days elapsed between Plaintiff's remote teaching accommodation due to his "complicated autoimmune disease" with "supporting documentation . . . submitted to the Dean's office in June 2010," and Aubrey Kent drafting a letter under Anderson's name in which

Kent stated (again, as the Dean) that Han "presents a fair yet not outstanding case, and I, therefore, do not support his application for tenure and promotion." *See* Ex. HHH, ECF Doc. No. 38-61, at 6. Anderson's draft back to Kent and Basu came a day later, and substantially adopted Kent's version, including the negative recommendation. Ex. III, ECF Doc. No. 38-62, at 6. This time period—three and four days—between a request for accommodation and decision to make an adverse action is unusually suggestive of discrimination would warrant denial of Defendant's motion as to Plaintiff's disability discrimination claims under the ADA and PHRA even if it was not accompanied with Kent's description of Plaintiff's disease and accommodation request as "medical shit" that does not matter and should not be accommodated. With that statement of hostility, Plaintiff establishes both *prima facie* causation and, as discussed below, sufficient evidence of pretext that the Court should deny Defendant's motion for summary judgment as to the ADA and PHRA discrimination claims based on this evidence alone.

## 2. <u>Additional Evidence of a Causal Link between Plaintiff's Disability and Dean Anderson's 2021 Tenure Denial Recommendation Exists.</u>

### a. Anderson and Kent expressed hostility towards providing information about Plaintiff's disability to reviewers, including changing long-standing Temple procedures in order to prevent such discussions.

Despite Plaintiff being entitled to trial on his disability discrimination claim related to his 2021-2022 tenure denial based solely on the unusually suggestive timing and disability-based hostility evidenced by Kent's "medical shit" comment, there is significant additional evidence in the record showing Defendant is not entitled to summary judgment as to these claims.

First, Temple failed to inform external reviewers that Plaintiff's clock had been extended, and when Dr. Sarkar informed Kent that more than one of the 2019 reviewers had questioned the temporal gap in Plaintiff's publication record and whether Sarkar could share with the reviewers

information about Plaintiff's medical leave, Kent told Sarkar he should not affirmatively offer this information, but, *if asked,* tell the reviewer that "one year should not count." PSAF at ¶ 10. Sarkar understood this directive to mean he should not share this information, and when he responded to the reviewer who had provoked Sarkar's query, did not even tell the reviewer that "one year should not count." PSAF at ¶¶ 11-12.

To be clear, at this point, Kent should have told Sarkar to (a) **affirmatively** tell the reviewers that **two years** should not count.  A jury could interpret this as evidence of discriminatory intent. *See Veikos,* 2022 U.S. Dist. LEXIS 12723 at *10 (E.D. Pa. Jan. 11, 2022) (failing to inform external reviewers of clock extensions is a procedural irregularity which may be evidence of discriminatory intent).

Second, during the 2019 cycle, after the external reviewers questioned Plaintiff's publication record, Plaintiff **added** a line to his CV disclosing his medical leave and medical condition, added the new CV to his dossier, and asked Kent if he could speak to the Department Committee in-person "to explain his personal situation," a clear reference to his medical issues. PSAF at ¶ 16. Kent told him it was not appropriate. *Id.* Anderson testified that he spoke directly to Kent about this request and told Kent that Plaintiff should not be permitted to talk to the Department Committee even if the Committee wanted to talk to him. *Id.*

Third, at the next stage of the 2019 application in front of the School P&T Committee, Kent **affirmatively** reached out to Steven Balsam, the chair, and said he had reason to believe "may be bugging you or your committee members," and asked Balsam to let Kent know if Plaintiff approached him or others, so that Kent could intervene so the work could proceed "in confidence, and without being subjected to inappropriate personal appeals from candidates." PSAF at ¶ 23. Balsam responded that Plaintiff had not been making such overtures, but that Balsam had invited

14

**every** candidate to email him or meet with him in person. *Id.* Three weeks prior, Plaintiff had provided his medical statement and medical records to Kent to add to his file, PSAF at ¶ 19, allowing a jury to conclude that Kent (and Anderson) considered the medical statement and medical records to constitute an "inappropriate personal appeal."

Kent and Anderson's hostility towards Plaintiff discussing his medical condition continued during the 2019 School P&T Committee deliberation. As part of Balsam's practice for conducting those deliberations, he would invite candidates to address the committee in person, with a faculty advocate from their department. PSAF at ¶ 29. Balsam would also hold a "straw vote" and would inform candidates of the results of the straw vote prior to their in-person presentation. PSAF at ¶¶ 24, 29. Plaintiff's initial straw was 5-4. PSAF at ¶ 25. After Plaintiff and Dr. Sarkar presented to the committee and *inter alia* discussed Plaintiff's medical condition (including Sarkar sharing that Plaintiff had been in the ICU for a month due to his disability), the Committee voted again, and this time voted 7-2 in favor of recommending tenure. JSF at ¶ 56; PSAF at ¶ 24, 29-31. Balsam testified that when Kent found that the Committee had changed its "vote" for Plaintiff and two other individuals, Kent was infuriated and "blew his stack," telling Balsam that candidates were to be forbidden from addressing the Committee going forward and that allowing them to do so was a violation of the union contract. PSAF at ¶ 25. Balsam later discussed this with union president, who stated that contact between the candidate and the Committee was not prohibited by the union contract. PSAF at ¶ 27. Anderson testified that he had directed Kent to tell Balsam that such communication should be prohibited. PSAF at ¶ 25-Response. As with Kent's efforts to limit disclosure of the medical issues to external reviewers, a jury could conclude that Kent's anger at Plaintiff and Sarkar being able to communicate with the Committee about Plaintiff's medical condition is evidence of discriminatory intent. *See Veikos,* 2022 U.S. Dist. LEXIS 12723 at *10.

Notably, Dr. Sarkar was able to communicate with the University P&T Committee in 2020, and also shared Plaintiff's medical condition with that Committee, and a majority of those voting voted to recommend Plaintiff for tenure. PSAF at ¶ 32. Neither Plaintiff nor Sarkar were permitted to meet with either Committee in 2022. PSAF at ¶ 53-54. A jury could include that Temple's prohibition of such meetings was because of Plaintiff and the discussion of his medical condition, and, accordingly, this change in procedures is evidence of discriminatory intent. *See Veikos,* 2022 U.S. Dist. LEXIS 12723 at *10.

Finally, when the 2021 School Committee debated whether to include information about Dr. Han's health struggles in its recommendation letter, committee members expressed concern about "lawsuits over tenure" and being "deposed"—revealing anxiety about the legal implications of Dr. Han's disability. PSAF at ¶ 63. More tellingly, Thatcher stated that mentioning the medical issue "given the extra years" clouds the assessment and might create "path dependencies in future cases." *Id.* This indicates concern that acknowledging Dr. Han's disability would establish precedent for accommodating other disabled faculty—a textbook example of discrimination.

### b. Anderson's 2020 Tenure Denial Letter Uses Plaintiff's Disability-Related Leave and Post-Leave Disability Period as Determinative Negative Criteria.

Plaintiff can also establish a causal link between the denial of his tenure and his disability because Anderson's 2020 Tenure Denial Letter negatively references Plaintiff's articles published over his entire tenure to suggest his frequency of publication is insufficient to warrant tenure.

In discussing Plaintiff's research record, Anderson criticized Dr. Han's "productivity" over the full eight years of his employment—a period that included his disability-related leave and recovery time. JSF at ¶ 14, Response; Ex. G, ECF Doc. No. 38-8, at 2. Anderson repeated this

time-based assessment which included periods of disability which should have been excluded when he stated "the number of articles **from 2012 to present**" fell "short of Fox's standard."

Defendant has argued that Plaintiff is misreading this letter, and, in fact, Anderson assessed Plaintiff as if he had come up after six years. But Anderson does not state that, and a jury could reject that self-serving interpretation of a letter which, on its face, includes the full period of Plaintiff's employment, disability time and non-disability time, in Anderson's assessment, and find that this is further evidence of disability discrimination.

### 3. **Plaintiff can also establish Defendant's purported reasons for denying tenure are pretextual, which also establishes causation.**

Temple claims it denied Dr. Han tenure because he had only three publications in "A" journals rather than the four required by the 2018 Guidelines. However, substantial evidence demonstrates this stated reason is merely pretext for discrimination and retaliation. Under the Third Circuit's framework, Dr. Han can establish pretext by showing either that Temple's articulated reason is unworthy of credence or that discrimination was more likely than not a motivating factor. *Fuentes v. Perskie,* 32 F.3d 759, 764 (3d Cir. 1994). The evidence here satisfies both prongs of this test, particularly when viewed through the lens of this Court's analysis in *Veikos v. Trustees of the University of Pennsylvania,* 2022 U.S. Dist. LEXIS 12723 (E.D. Pa. Jan. 11, 2022), which identified three key indicators of pretext in tenure cases: divergent assessments, inconsistent reasons, and procedural irregularities.

### c. **Divergent Assessments and Inconsistent Rationales**

Multiple levels of review reached contradictory conclusions about Dr. Han's qualifications, creating a genuine factual dispute about whether he met Temple's standards. While external reviewers, Dr. Han's Department Chair, the School P&T Committee, and the University P&T

Committee all found his research qualifications outstanding, Dean Anderson reached the opposite conclusion. JSF ¶¶ 56, 59; PSAF ¶¶ 24, 29-32. Even Anderson's assessment contains internal contradictions—he worried his 2022 draft letter was "too positive" because it acknowledged the "very, very high quality" of Dr. Han's research, prompting him to modify the draft to sound more negative. PSAF ¶¶ 74-77.

Anderson's private communications reveal different motivations than those stated in his official letters. He described Han as a "bubble case" and admitted he would "probably vote for tenure" if the Department Committee had supported it, but rejected Han because "the school will not lose anything" and "we can do better on the open market." JSF ¶ 58; Ex. Q. This market-based rationale appears nowhere in his official recommendations and contradicts Temple's tenure standards. When Anderson revised his 2022 letter, he added new criticisms not present in his 2020 letter, including a negative assessment of Han's citation count (which he had previously removed as an unfair metric for non-tenured professors) and claims about "limited influence or relevancy" of Han's work. Compare Ex. G with Ex. F with Ex. III with Ex. HHH. These shifting explanations strongly suggest pretext.

**Procedural Irregularities**

The tenure review process was marred by numerous procedural irregularities specifically related to Dr. Han's disability. Temple failed to inform external reviewers about Han's medical leaves, and when reviewers questioned gaps in his publication record, Kent instructed Department Chair Sarkar not to affirmatively offer this information. PSAF ¶¶ 10-14. When Han requested to discuss his "personal situation" (medical condition) with review committees, Anderson and Kent denied these requests as "inappropriate," despite this being standard practice. PSAF ¶ 16. After the School Committee reversed its vote in Han's favor following his presentation about his medical

18

condition, Kent "blew his stack" and prohibited all candidates from meeting with committees—changing a longstanding practice specifically after it benefited Han. PSAF ¶¶ 24-27, 29-31.

During the 2021 School Committee deliberations, committee members expressed concerns about "lawsuits over tenure," "being deposed," and creating "path dependencies" when discussing whether to mention Han's medical condition—revealing anxiety about the legal implications of acknowledging his disability. PSAF ¶ 63. The prohibition on candidate communications with committees in 2022 prevented Han from presenting information about his medical condition as he had successfully done in 2020. PSAF ¶¶ 53-54. Temple's dramatic change in procedures after Han's disability disclosure resulted in favorable committee votes is compelling evidence of discriminatory intent. See *Veikos,* 2022 U.S. Dist. LEXIS 12723 at *10.

**Inconsistent Application of Publication Standards**

Perhaps most tellingly, Dean Anderson claimed Han needed "one more top quality publication" for tenure (Ex. 1 at 119:11-20; 177:10-19), yet when Han achieved precisely that—publishing in the Journal of Business and Economic Statistics (JBES)—Anderson ignored it. Han informed Anderson about this paper in December 2021 while it was under final revision, and notified Kent of its acceptance shortly before the Dean's recommendation was transmitted. PSAF ¶¶ 66, 104. Despite knowing this fourth top publication was forthcoming, Anderson made no mention of it in his recommendation letter and later attempted to denigrate JBES as "not even B tier" during his deposition. PSAF ¶ 67. In reality, JBES was listed as an A- journal in the 2018 Guidelines and the 2021 Guidelines and ranked equivalent to journals Temple classified as "A" journals in the AJG ranking system Anderson himself had used in previous evaluations. *See* 2018 AJG Journal List, attached hereto as Exhibit 2; 2021 AJG Journal List, attached hereto as Exhibit 3; Ex. I at 13.

This inconsistency is particularly striking when compared to Anderson's 2016 recommendation of tenure for Oleg Rytchkov, who had only two clear A papers plus two papers Anderson argued should be counted as top-tier. Anderson gave Rytchkov credit for his solo-authored paper and for papers under review, considerations he denied to Han despite Han having a solo-authored paper and a paper under final revision. See 2016 Anderson Letter Re: Rytchkov, *attached hereto as* Exhibit 2. Had Anderson applied the same standards to Han as he did to Rytchkov, Han would unquestionably have satisfied the publication requirement by January 2022. This disparate treatment of similarly situated faculty is powerful evidence of pretext.

**Disability-Based Hostility**

Kent's influence on Anderson's decision is particularly troubling given Kent's documented hostility toward Han's disability. On January 3, 2022, Han inquired about remote teaching due to his autoimmune disease, and Kent responded by dismissing Han's "medical shit" as something that "doesn't matter." PSAF ¶ 103; Ex. KKJK at 2. The very next day, Kent began drafting Anderson's letter recommending against tenure. PSAF ¶¶ 72, 103. This letter falsely claimed that external reviewers noted "a slow pace and irregular consistency" in Han's publications—a claim the University Committee later determined appeared in none of the reviewer letters. PSAF ¶¶ 73, 80.

Kent actively worked to undermine Han throughout the process, criticizing his disability-related low teaching load (PSAF ¶ 94), characterizing his 2020 application as "the weakest case" (PSAF ¶ 99), failing to alert Anderson about Han's new top journal publication (PSAF ¶ 104), and expressing hope that Han would be denied tenure (PSAF ¶ 108). When Han filed a discrimination complaint, Kent volunteered to draft the response for Anderson (PSAF ¶ 109) and misrepresented Han's publication record to Assistant Provost Delaney, falsely claiming Han had only two "A" papers (PSAF ¶¶ 91, 97).

20

Finally, Temple's failure to preserve relevant evidence following Han's discrimination complaints—not implementing a litigation hold even after his EEOC charge—suggests consciousness of guilt. PSAF ¶¶ 110-112. Temple destroyed Professor Izenman's notes from the School Committee deliberations and Han's actual tenure application dossier containing Anderson's handwritten notes. PSAF ¶¶ 81, 112. This spoliation further supports an inference of discriminatory intent.

The totality of this evidence—divergent assessments, inconsistent rationales, procedural irregularities, inconsistent standards, disability-based hostility, and spoliation—provides ample basis for a reasonable jury to conclude that Temple's stated reason for denying Dr. Han tenure was pretextual, and that discrimination and retaliation were the true motivating factors.

### E. DEFENDANT'S MOTION SHOULD ALSO BE DENIED AS TO PLAINTIFF'S ADA AND PHRA RETALIATION CLAIMS FOR REQUESTING A REASONABLE ACCOMMODATION.

As noted above, Plaintiff has demonstrated unusually suggestive timing and active hostility on the part of Kent and, by proxy, Anderson, to his request for an ADA accommodation and Anderson's dispositive negative tenure recommendation communicated in January 2022. Likewise, the facts supporting pretext as to disability discrimination also support finding pretext for Plaintiff's ADA and PHRA retaliation for requesting a reasonable accommodation claim.

Plaintiff made two requests for accommodation during the 2021-2022 tenure cycle—in August 2021 and in January 2023. JSF at ¶ 69, 103. Anderson confirmed that he was aware of either one or both requests, and stated it had been made with such short notice it was "impossible to deal with." PSAF at ¶ 64. Kent, as noted above, referred to the second request as "medical shit," and stated that it did not need to be accommodated.

A jury could conclude based on the temporal proximity between these requests (unusually suggestive in the case of the second request), coupled with Kent's antagonism towards the request, that Plaintiff can prove both causation and pretext with respect to Plaintiff's ADA and PHRA claim that Anderson recommended against tenure in 2022 because of Plaintiff's requests to accommodate his disability by allowing him to teach remotely.

### F. PLAINTIFF HAS ESTABLISHED A PRIMA FACIE CASE OF RETALIATION FOR COMPLAINING ABOUT DISABILITY DISCRIMINATION.

Plaintiff has also established a *prima facie* case of retaliation for complaining about disability discrimination in violation of the ADA and PHRA. Plaintiff explicitly complained about discrimination on January 18, 2022. PSAF at ¶¶ 88. Plaintiff can establish causation between this complaint and the adverse action because a jury could conclude that Dean Anderson learned of this complaint from Aubrey Kent after Delaney reached out to him about the complaint, Kent expressed active hostility and lobbying against Plaintiff in response to this complaint by misrepresenting Plaintiff's article count to Delaney in anticipation of Delaney working with the University Committee, and stating that Plaintiff was saying a lot of things to the Provost to try to get a positive vote, PSAF at ¶ 107, and Anderson made a further lobby against Plaintiff after the complaint had been made when Anderson met with Mandel, after which Mandel decided he concurred with Anderson's negative recommendation. PSAF at ¶ 82. Likewise, Mandel was made aware of the complaint on January 20. PSAF at ¶ 90.

Given the new hostility Kent displayed regarding Plaintiff after the complaint, and that Anderson did not, apparently, discuss Plaintiff's new JBES article with Mandel but instead simply reiterated his opposition to Plaintiff's case, Plaintiff has established a causal link between disability discrimination complaint and the Provost's negative recommendation (which incorporated a verbal

negative recommendation from Anderson made after the discrimination was made and disseminated).

### G. PLAINTIFF HAS ESTABLISHED A PRIMA FACIE CASE FOR FMLA RETALIATION-FOR-EXERCISE AND INTERFERENCE

Dr. Han has established a prima facie case for his claims under the Family and Medical Leave Act. For his FMLA retaliation claim, Dr. Han must demonstrate that: (1) he invoked his right to FMLA-qualifying leave; (2) he suffered an adverse employment action; and (3) there was a causal connection between his FMLA leave and the adverse action. *Lichtenstein v. Univ. of Pittsburgh Med. Ctr.,* 691 F.3d 294, 302 (3d Cir. 2012). For his FMLA interference claim, Dr. Han must show that: (1) he was entitled to benefits under the FMLA; and (2) he was denied those benefits. *Callison v. City of Philadelphia,* 430 F.3d 117, 119 (3d Cir. 2005).

There is no dispute that Dr. Han took two FMLA leaves: from August 2015 to January 2016 for the birth of his daughter, and from August 2016 to January 2017 for his myasthenia gravis condition. It is also undisputed that Dr. Han suffered an adverse employment action when Temple denied him tenure. What Temple disputes is the causal connection between these events. The evidence, however, establishes a clear link between Dr. Han's FMLA leave and Temple's decision to deny him tenure, because Defendant denied Plaintiff because he had taken FMLA leave and because it feared Plaintiff would need to take another FMLA leave due to his disability.

### 1. <u>FMLA Retaliation-for-Exercise</u>

While Temple argues that the significant time gap between Dr. Han's FMLA leave and tenure denial precludes an inference of causation, this position ignores the realities of the tenure process and the Third Circuit's guidance that "the mere passage of time is not legally conclusive proof against retaliation." *Krouse v. Am. Sterilizer Co.,* 126 F.3d 494, 503 (3d Cir. 1997). In tenure

23

cases especially, retaliation may manifest years after the protected activity because tenure decisions occur on a fixed timeline.

Instead of focusing narrowly on temporal proximity, the Court must examine the evidence of retaliatory animus that emerged during the evaluation process. This evidence is substantial. First, as noted above, Temple improperly evaluated Dr. Han's productivity during periods he was on FMLA leave. JSF at ¶ 14, Response; Ex. G, ECF Doc. No. 38-8, at 2. Dean Anderson's 2020 recommendation letter specifically criticized Dr. Han's publication output over "his eight years at Fox," explicitly counting the periods when he was on FMLA leave. In the 2022 letter, Anderson described Plaintiff as having published with "irregular consistency" and stated that the "inconsistent production of high-quality published articles" was insufficient to satisfy Defendant's tenure standards. A jury could conclude that these criticisms meant Anderson was using the time Plaintiff was on FMLA leave and not publishing as a determinative negative factor in Anderson's decision to recommend denying tenure.

Second, Temple cannot separate its hostility for discussion of Plaintiff's medical leave and disability with a hostility for Plaintiff having taken an FMLA leave. That hostility, detailed above, which supports Plaintiff's discrimination claim, also supports a finding that Defendant discriminated against Plaintiff because his medical condition required an FMLA leave. Finally, Plaintiff can establish that Defendant's purported reasons for denying tenure and terminating him are pretextual for the same reasons set forth above.

### 2.  FMLA Interference Related to Future Leave

Under an FMLA interference claim, "the employee need not show that he was treated differently than others [, and] the employer cannot justify its actions by establishing a legitimate business purpose for its decision." *Ross v. Gilhuly,* 755 F.3d 185, 192; *Erdman v. Nationwide Ins.*

*Co.,* 582 F.3d 500, 509 (3d Cir. 2009). Here, the jury could conclude based on the above cited evidence that Kent and Anderson were considered that Plaintiff's disability would allow him to ask for FMLA leave any time there was a severe respiratory epidemic and he would be required to teach in person, and accordingly, Defendant interfered with Plaintiff's right to take future FMLA leaves.

### H. PLAINTIFF HAS ESTABLISHED *PRIMA FACIE* CASES OF RACE, NATIONAL ORIGIN, AND RACE-PLUS-GENDER DISCRIMINATION.

Dr. Han has established a prima facie case of race and national origin discrimination under Title VII, Section 1981, and the PHRA.

The first three elements are easily satisfied: Dr. Han is Chinese and Asian, placing him in protected classes; he was qualified for tenure based on his publications and the positive evaluations of the Department Committee, Department Chair, and School Committee; and he suffered an adverse employment action when Temple denied him tenure.

The crucial fourth element—an inference of discrimination—is amply supported by the record evidence. Temple attempts to fragment Dr. Han's race and national origin claims, arguing that Dr. Han's use of Chinese female professors as comparators undermines his claims. This mischaracterizes Dr. Han's position, and the difference between discriminating against an individual based on their identity versus discriminating in favor of an individual because of their identity.

Plaintiff's primary claim is that he was discriminated against because he was Chinese and Asian. But Plaintiff also claims that his race discrimination also contained a component of race-plus-gender discrimination, because **had** Plaintiff been female, the evidence suggests this would have offset the discrimination Plaintiff faced as a non-favored minority. Such race-plus or sex-plus

claims are fully cognizable. *See Phillips v. Martin Marietta Corp.,* 400 U.S. 542, 544, 91 S. Ct. 496, 27 L. Ed. 2d 613 (1971); *Weightman v. Bank of New York Mellon Corp.,* 772 F. Supp. 2d 693, 701-02 (W.D. Pa. 2011). As the Western District of Pennsylvania noted, sex-plus discrimination is really just sex discrimination; race-plus discrimination is really just race discrimination. *Zerfa v. Acosta, Inc.,* Civil Action No. 21-463, 2023 U.S. Dist. LEXIS 58283, at *10 (W.D. Pa. Mar. 30, 2023). What the sex-plus/race-plus theory means is simply that an individual can be discriminated on the basis of a protected characteristic even if **not** all segments of that population are subjected to discrimination.

Here, what is clear is that Anderson and Kent were specifically providing favored hiring preference to non-Asian minorities and women, and the more boxes checked, the better. The record contains direct evidence of Temple's preference for candidates from certain racial and national backgrounds over others, with a specific bias against Asian candidates. Dean Anderson testified that Temple considers Asians to be "white" for diversity purposes. PSAF at ¶ 50. This remarkable admission reveals that Defendant—via Anderson and Kent—were trying to hire more minority candidates, but did not consider Asians to be a minority.

Anderson also testified that academia's desire to hire top African American researchers and academics was so fierce, it was a "reverse discrimination issue at this point." PSAF at ¶ 46. Finally, Anderson's hiring strategy, as outlined in a document drafted by Kent and approved by Anderson, emphasized that Fox was "committed to increasing both the number and types of diversity at Fox" and that 9 out of 10 recent faculty hires came from "diversity" groups defined as "Female, African-American, Hispanic, and/or non-white/international." PSAF at ¶ 47.

This document stated that "all searches are guided by that commitment, from purposive advertising, to committee processes, candidate screening/selection, through to the ultimate hiring

decision." PSAF at ¶ 47; Ex. EEE at Temple 011562. There is no reason for a jury to doubt that this explicit hiring preference—an illegal one—applied to Anderson's tenure decisions, given the racial and ethnic composition of Fox's faculty would affected by tenure decisions, especially given the possibility that Fox's faculty headcount would be shrinking in the future.

Most damning is the evidence that Temple was actively discussing replacing Dr. Han with candidates specifically valued for their non-Asian racial backgrounds:

- On February 25, 2020, Airoldi sent an email to Kent and Anderson proposing Fox should hire Hedibert Lopes, described as "a Brazilian-born U.S. citizen of African American descent" specifically because "Xu Han is leaving us." PSAF at ¶ 37; Ex. YY at Temple 011504.

- Airoldi later emphasized that Lopes would be a great candidate despite not having a "solid record of publications in top statistics journals" because he "happens to be a double minority candidate." PSAF at ¶ 39; Ex. ZZ at Temple 02226-2227.

- On March 28, 2022, Airoldi suggested Ricardo Masini would make a good replacement for Dr. Han, noting he would be a "minority/opportunity hire." PSAF at ¶ 86; Ex. AAA at Temple 011857.

- On June 22, 2022, Anderson directed Kent to reach out to Masini about coming to work at Fox because Anderson was "alright preempting the market, especially for a diverse candidate." PSAF at ¶ 87; Ex. GGG at Temple 011892.

The pattern of hiring and promotion decisions at Fox also supports an inference of discrimination. Airoldi testified that in terms of hiring minority candidates, "every university is always trying to hire minority candidates" and it was generally understood that a "diverse candidate

may be more appealing," especially when there was not necessarily a specifically open position. PSAF at ¶ 42; Ex. XX at 94:16-96:16.

Anderson confirmed that during this time period, he was trying to hire "diverse" faculty, directed individuals to look for minority candidates, and wanted to increase racial and gender diversity. PSAF at ¶ 43. Ex. C at 75:22-76:01, 76:18-77:04.

Accordingly, what the above evidence suggests is that coupled with Anderson's statement that he considered Plaintiff a "bubble candidate," a jury could conclude that had Plaintiff been African-American, a woman, or an African-American woman, Anderson would have recommended Plaintiff receive tenure, and that recommendation would have led to Plaintiff receiving tenure. Given same, Plaintiff has adduced sufficient evidence to establish *prima facie* causation related to his race, national origin, and race-and-national-origin-plus-gender claims, and Plaintiff can establish pretext for the same reasons as set forth above. Accordingly, the Court should deny Defendant's summary judgment motion as to these claims as well.

## IV.   <u>CONCLUSION</u>

For the reasons set forth above, Temple University's motion for summary judgment should be denied in its entirety.

Respectfully submitted,

/s *Joshua S. Boyette, Esq.*

Joshua S. Boyette, Esq.

**SWARTZ SWIDLER, LLC**
9 Tanner Street, Suite 101
Haddonfield, NJ 08033
Office: (856) 685-7420
Fax: (856) 685-7417

*Attorney for Plaintiff*

Date: May 17, 2025