**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **XU HAN**,<br><br>　　　　　*Plaintiff,*<br><br>　　v.<br><br>**TEMPLE UNIVERSITY**,<br><br>　　　　　*Defendant.* | **Case No. 2:23-cv-04433-JDW** |

### <u>MEMORANDUM</u>

Universities ask their students to demonstrate mastery before awarding them degrees. They ask their faculty to do the same before granting them tenure. The tests differ in form, but both serve a similar end: to separate promise from permanence. That process, however, often stirs passions beyond the classroom. When a tenure decision intersects with claims of bias or retaliation, the dispute moves from academic halls to legal ones. And when it arrives in court, the question is not whether the candidate was "good enough," but whether the law was violated.

Xu Han claims that his tenure application was good enough, and that the only explanation for Temple University's decision to deny him tenure is discrimination, and he posits that the discrimination was based on his disability, his race, his national origin, his sex, his complaints about discrimination, and his decision to take leave under the Family And Medical Leave Act. For most of those claims, he has no supporting evidence. For his

disability discrimination claims, he has evidence that a non-decision-maker who was involved in his tenure application harbored discriminatory animus, but he has no evidence that that person's animus tainted the process. Though Dr. Han disagrees with Temple's decision, he cannot prove that the decision was anything other than Temple's conclusion that his application was not quite good enough. I will therefore grant Temple's summary judgment motion.

## I.    BACKGROUND

### A.    Factual History

#### 1.    Hiring policy at Fox

During the relevant time period, the Fox School made a concerted effort to recruit and hire diverse faculty members. To that end, the former Dean at Fox, Ron Anderson, directed professors and staff "to look for minority candidates" to hire. (ECF No. 38-4 at 76:22.) And the Fox School put out ads that "strongly encourage[d]" minority candidates to apply. (*Id.* at 76:7.) Dean Anderson thought that the faculty at Fox should look like the student body or "at least [be] representative of the American population." (*Id.* at 77:3-4.) As part of the Dean's strategy to increase racial and gender diversity at the school, the first step was to develop a diverse pool of applicants. Then, out of that pool, Fox "would pick the strongest athlete, the best candidate." (*Id.* at 77:20-21.) Dean Anderson described the desire for diverse faculty as ubiquitous within the academic community.

In August 2021, a Senior Associate Dean at the Fox School, Aubrey Kent, circulated a draft strategy for hiring faculty.[1] The strategy contained a "commitment to diversity" and explained that Fox was "committed to increasing both the number and types of diversity within [the] school." (ECF No. 38-58 at Temple 011562.) The draft also explained that "[a]ll searches [for faculty] are guided by this commitment, from purposive advertising, to committee processes, candidate screening/selection, through to the ultimate hiring decision." (*Id.*) As a "data point," the draft noted that "[i]n the past 2 years, Fox ha[d] made 10 faculty hires, with 9 of these coming from groups representing diversity (Female, African-American, Hispanic, and/or non-white/international)." (*Id.*) Temple does not consider Asian professors to be a minority; instead, it considers them to be White.

Dean Anderson and other professors at Fox kept an eye out for diverse faculty to recruit. For example, in February of 2020, professor Edoardo M. Airoldi alerted Dr. Kent and Dean Anderson about a potential "great opportunity" to hire Dr. Hedibert Lopes who was a "Brazilian-born US citizen of African American descent." (ECF No. 38-52.) In a later email discussing potential hires, Dr. Airoldi continued to promote Dr. Lopes, characterizing him as "a double minority candidate." (ECF No. 38-53 at Temple 002227.) Years later, Dr. Airoldi flagged another potential candidate for Fox whose profile was "very similar to [Dr.] Lopes" and would also be "a minority/opportunity hire[.]" (ECF No. 38-54.)

---

[1]    Faculty includes tenured, tenure-track professors, and non-tenure track professors.

While the Fox School took race, ethnicity, and sex into account when recruiting and hiring faculty members, the tenure process was different. When deciding whether to award tenure, Fox did not give any weight to ethnic or racial diversity. Instead, the reviewers "evaluate tenure packets based on the merit of the packet itself" and "keep a blind eye towards gender or racial diversity." (ECF No. 38-4 at 75:12-16.)

### 2.    The tenure process at Temple

Pursuant to the collective bargaining agreement between Temple's faculty union and Temple (the "CBA"), Temple must review tenure-track faculty members for tenure no later than their sixth year of original appointment. However, the CBA provides that a tenure-track faculty member may request a one-year extension to the tenure clock for the birth of a child or a serious health condition. If a faculty member requests a tenure track extension for these reasons, Temple does not increase the minimum expectations necessary to achieve tenure.

When an assistant professor applies for tenure, the candidate prepares a research packet with his or her research and scholarship accomplishments. The candidate then selects two external reviewers, and Temple selects six external reviewers, comprised of scholars in the candidate's discipline, to evaluate the candidate's portfolio. The external reviewers submit letters that analyze and evaluate the candidate's research portfolio and provide comments and criticisms on the candidate's scholarship. The letters become part of the candidate's tenure portfolio for the subsequent levels of review and recommendation.

4

Once the packet is ready, including the letters, the internal review process begins. A committee of tenured faculty from the candidate's academic department (the "Department Committee") reviews the tenure packet and letters from external reviewers and provides its own recommendation. Once the Department Committee completes its review, the Department Chair receives the candidate's tenure packet, the letters from external reviewers, and the Department Committee's recommendation. The Department Chair conducts his or her own review and makes a recommendation as well.

The process then moves to the Fox School Promotion And Tenure Committee (the "School Committee"). The School Committee consists of one member from each academic department at Fox. They review the packet, confer, and make their recommendation to the Dean of the Fox School. Next, the Dean completes an independent review of the packet. The Dean might solicit input or discuss the application with members of his or her office. The Dean then prepares a recommendation concerning the tenure application and sends that recommendation. along with the candidate's portfolio. to the University Tenure And Promotion Advisory Committee (the "University Committee") for review. A subcommittee of the University Committee completes its own review of the tenure portfolio, votes on whether to recommend tenure, and then communicates its recommendation to the University Provost.

The Provost reviews the candidate's portfolio, including the recommendations from each of the earlier levels of review. Though the Provost may vary from the Dean's recommendation, "the Provost typically tries to support the Dean in the decision." (ECF

No. 43-1 at 255:2-4.) Once the Provost makes his or her recommendation, he or she forwards the entire tenure packet to the University President, along with the Provost's recommendation and summary of the case. Then, the President makes a recommendation to the Board Of Trustees, and the Board makes the final decision.

At each stage of the process, the candidate receives a copy of the recommendation either for or against tenure. If there is a recommendation against tenure, the candidate may submit a rebuttal letter, and that letter becomes part of the tenure portfolio.

### 3.    Dr. Han's employment at Temple

Temple hired Dr. Han as a tenure-track assistant professor in 2012. He taught statistics in the Fox School. Dr. Han is a male, Chinese national. Initially, he was scheduled for a tenure evaluation by the 2017-2018 academic year. However, Dr. Han extended his tenure clock twice during his time at Temple.

In 2015, Dr. Han requested and received an approved leave under the Family Medical Leave Act for the fall semester (August 2015 to January 2016) for the birth of his daughter. Though he did not teach during the fall semester, Dr. Han opted to work part-time on research. He returned to work full-time in January 2016. Then, in the fall of 2016, Dr. Han sought and received a second approved leave pursuant to the FMLA due to a medical condition called myasthenia gravis. He spent a portion of this time in the hospital, but his doctor cleared to him return to work "full duty with no restrictions" as of January 17, 2017. (ECF No. 38-9.) Though he returned to work, Dr. Han felt that his medical condition hampered his productivity through the end of the following school year.

Each of these two leave periods extended Dr. Han's tenure clock by a year. As a result, his tenure deadline moved to the 2019-2020 academic year. Thus, by the time Dr. Han applied for tenure, he was starting his eighth academic year at Temple.

### a.    The 2019-2020 tenure application

When Dr. Han applied for tenure in 2019, Temple evaluated his application pursuant to the 2018 Promotion And Tenure Guidelines For Tenure Track Faculty (the "2018 Guidelines"). The 2018 Guidelines set forth requirements pertaining to research, teaching, and service. For example, the 2018 Guidelines required "outstanding" research performance and explained that an assistant professor could demonstrate such performance by publishing "at least four … publications in Business A and/or Non-Business A journals in the candidate's discipline and with additional publications preferably in A-* and A- journals." (ECF No. 38-10 at Temple 005939.) The 2018 Guidelines included an appendix of journals that the Fox School considered to be "top tier." The applicable Guidelines also noted that "quality [was] preferable to quantity" and that "[t]he number of publications … are recommended guidelines, to be applied flexibly by the department and school P&T committees after taking into account a candidate's overall research portfolio[.]" (*Id.*) The 2018 Guidelines explained that Temple valued sole-authored papers more than joint-authored papers and lead-authored papers more than papers where the candidate was not the lead author.

In addition to publications, a candidate could demonstrate research excellence through receipt of research awards, acquiring competitive research grants, citation counts,

and journal impact, among other things. The 2018 Guidelines also required excellence and commitment in teaching, as well as quality service to the school and its students.

During his time at Temple, Dr. Han had published three papers in "A" journals, as Temple's 2018 Guidelines defined them. He also published a paper in an "A-" journal. These papers were part of his tenure packet. In addition, after the external review process, Dr. Han added a "Medical Statement" to his tenure packet that revealed his health struggles with myasthenia gravis and explained his two FMLA leaves.

Following the external reviews, the Department Committee recommended against promotion and tenure by a 0-2 vote with one abstention. However, the Department Chair, Dr. Sanat Sarkar, recommended in favor of granting tenure.

At the next level of review, the School Committee held a straw vote on Dr. Han's application and voted 4-5 against recommending tenure. At that time, the chair of the School Committee, Steven Balsam, permitted tenure candidates and department chairs to present to the School Committee. Following the straw vote, he told Dr. Han the results of the straw vote and invited him and Dr. Sarkar to speak to the School Committee. Dr. Sarkar and Dr. Han presented to the Committee, during which Dr. Sarkar told the Committee about Dr. Han's medical condition and how he had been hospitalized as a result. After Dr. Han and Dr. Sarkar met with the School Committee, the Committee voted again—this time 7-2 in favor of recommending tenure for Dr. Han.

Dr. Han's application advanced to the Dean's Office. Dean Anderson reviewed Dr. Han's portfolio and the recommendation letters from the previous levels. Dean Anderson

considered Dr. Han's tenure application to be a "bubble case" that "was just shy" of warranting tenure. (ECF No. 38-4 at 119:14, 120:2.) Dean Anderson "generally lean[ed] towards 'not recommending tenure' for bubble candidates" because he was of the view that "the school [would] not lose anything but [sic] letting go of marginal candidates." (ECF No. 38-18.) Thus, in his letter dated January 6, 2020, Dean Anderson recommended against tenure for Dr. Han, opining that "Dr. Han present[ed] a solid but not outstanding research record ...." (ECF No. 38-8 at 3.)

Dean Anderson's letter noted that Dr. Han had taken two leaves due to the birth of a child and a medical condition and because of those leaves, Dr. Han was "only in his sixth year with respect to the tenure clock[,]" even though he was in his eighth year at Temple. (*Id.* at 1.) He noted that during his "eight years at Fox[,]" Dr. Han's publication of four papers was "more commensurate with applicants for assistant professor positions rather than a candidate for promotion to associate professor with tenure." (*Id.*) He noted that just three of those papers were "A" papers and one was an "A-." According to Dean Anderson, Dr. Han "didn't have enough A's[,]" and "[i]f there had had one more A" it would have been "easy" for him to recommend tenure. (ECF No. 38-4 at 119:17-18, 21-22.) The Dean also expressed concern that the external reviewers had penned unfavorable letters and that Dr. Han had no external funding for grants. He also testified that he had held Dr. Han to "the same level of standard, even though it was over a longer period." (*Id.* at 119:24 – 120:2.)

Following Dean Anderson's recommendation against tenure, Dr. Han's application progressed to the University Committee. In its own letter, the University Committee noted that Dr. Han's research record had received mixed reviews and that there were "questions about the level of his productivity." (ECF No. 38-20 at 5.) The University Committee's vote was also "mixed," with three members voting in support of tenure and two voting against.[2] At the next level of review, however, then-Provost JoAnne Epps supported Dean Anderson and recommended against tenure for Dr. Han. Then-President Richard Englert recommended against tenure.

At that point in the process, the CBA provided Dr. Han with two options: (1) withdraw his tenure application and request a second review the following year, waiving the right to appeal the final decision; or (2) proceed with the current review and retain the right to appeal the ultimate decision. Dr. Han chose to withdraw his application and try again the following year. However, because the Covid-19 pandemic was raging, Temple gave all candidates an extra year on their tenure clocks, extending Dr. Han's second application to the 2021-2022 school year.

**b.    The 2021-2022 tenure application**

For the 2021-2022 academic year, Temple permitted each tenure candidate to choose whether to apply pursuant to the 2018 Guidelines or the 2020 Guidelines For Promotion And Tenure ("2020 Guidelines"). Dr. Han opted for the 2018 Guidelines. Again,

---

[2]    One member was absent and did not vote.

he included information about his medical condition in his tenure packet and provided a medical statement to each level of reviewers. Dr. Han did not publish any additional papers between his first tenure review and his second tenure review. However, he had another publication in the pipeline and included that information in his packet.

Like the first time, the second tenure process began with external reviewers. During the next round of review, the Department Committee acknowledged that Dr. Han's three publications in "A" journals fell short of the "quantitative requirement" of four publications but explained that "the high quality of the [his] publications justif[ied] the conclusion that he meets [the research] requirement." (ECF No. 38-29 at Temple 016312–13.) The Committee also relied on evidence that Dr. Han had "a series of high-quality papers in the pipeline," and made a unanimous recommendation to grant tenure. (*Id.* at Temple 016313.) The Department Chair, Dr. Sarkar, also recommended tenure. Next, the School Committee voted 5-4 in favor of granting tenure for Dr. Han, although those in the minority expressed concern about the quantity of his research.

Dean Anderson was next. Before Dean Anderson issued his recommendation, Dr. Han sent him a paper that was under major revision at the Journal of Business and Economic Statistics ("JBES"). Dean Anderson knew that was "a promising sign that the paper [would] eventually be accepted for publication." (ECF No. 43-1 at 217:4-5.) While Dean Anderson held the view that JBES wasn't even a "B tier" journal (*id.* at 217:14), JBES was on the list of journals that the Fox School considered to be "top tier." Fox rated it as a "A-" journal in the 2018 Guidelines, and the Academic Journal Guide ("AJG") also rated

it as a top journal in 2018 and 2021. Temple uses the AJG "to assist ... in rating the quality of journal outlet," and Dean Anderson used it during Dr. Han's first tenure review. Despite the high rating, Dean Anderson did not give any weight to the JBES paper or the fact that it was on the road to publication.

On January 3, 2022, before Dean Anderson issued his recommendation, Dr. Han emailed the Office of the Dean and asked if his upcoming course "could go virtual due to [his] health conditions." (ECF No. 38-88 at Temple 015183.) He explained that myasthenia gravis put him in a high-risk category for contracting COVID, and he referenced a prior letter from his doctor.  When a staff member asked whether there was any "wiggle room" to grant Dr. Han's request, Dr. Kent responded in the negative: "If he was scheduled for in person, then his medical shit doesn't matter, since he hasn't done the appropriate paperwork to be virtual." (*Id.* at Temple 015182.) Dean Anderson learned about Dr. Han's request and said that it had come in too late to make any adjustments.

Around the same time, members of the Dean's Office, including Dean Anderson, Dr. Kent, and Dr. Sudipta Basu, had reviewed Dr. Han's second tenure application on their own and met to discuss their individual recommendations. Dr. Kent and Dr. Basu recommended against tenure because "not enough [had] changed" since Dr. Han applied the first time. (ECF No. 43-1 at 224:14-15.) The attendees did not discuss Dr. Han's medical issues during this meeting. (*See id.* at 226:12-18.) Ultimately, Dean Anderson decided not to recommend tenure for Dr. Han, and Dr. Kent prepared the first draft of the Dean's letter recommending against tenure. Dean Anderson revised the letter but was concerned that

it was "too positive." (ECF No. 38-62 at Temple 008345.) Both Dr. Kent's draft and the final letter stated that "[t]he external reviewers note[d] a slow pace and irregular consistency to Dr. Han's publications ...." (ECF No. 38-7 at Temple 015331.) However, this comment did not appear "in any of the [external reviewers'] letters." (ECF No. 38-33 at Temple 009809.)

In the final draft dated January 12, 2022, the Dean expressed concern about the lack of any new publications to bolster Dr. Han's application, noting that all six of his publications "were part of the record in his application in 2019-20 when the department committee and dean[']s office did not support [him]. Since that review two years ago, Dr. Han has had two papers under peer review but no additional publications." (ECF No. 38-7 at Temple 015330.) He explained that "the inconsistent production of high-quality published articles falls short of the articulated standards at Fox and those in the broader discipline" and that there were no other factors—"such as high citation counts, external funding and awards, or translational potential"—that could "mitigate the shortcoming in productivity[.]" (*Id.* at Temple 015331.)[3]

---

[3]      On January 12, 2022, Dr. Han emailed Dr. Kent and advised him that JBES had accepted his article for publication. However, it is not clear from the record whether Dr. Kent received or reviewed this email before finalizing the letter and affixing Dean Anderson's signature. In fact, when Dr. Kent shared Dean Anderson's recommendation with Dr. Han two days later, Dr. Kent told Dr. Han that they completed the letter before receiving the updated information and recommended that Dr. Han "writ[e] a note to highlight the new publication." (ECF No. 38-93.)

After the Dean made his recommendation, Dr. Han complained of discrimination. On January 18, 2022, he wrote to Temple's Director of Equal Opportunity Compliance, alleging that the Dean and a department representative were "playing discriminative roles against [his] case[.]" (ECF No. 38-74 at Temple 015406.) Though he did not allege disability discrimination by name, he did note that he suffered from myasthenia gravis—"which is classified as disability"—and explained that "this medical issue has greatly affected [his] research." (*Id.*) Two days later, Dr. Han emailed another complaint to the Vice Provost of Faculty Affairs and made clear his belief that Dean Anderson's criticism of his application "indicate[d] his discrimination against [Dr. Han's] disability." (ECF No. 38-76 at 2.) That same day, the Vice Provost responded to Dr. Han and added the then-Provost, Gregory Mandel, to the email thread.

In the meantime, the University Committee was evaluating Dr. Han's tenure application. By this point in time, JBES accepted Dr. Han article for publication, and Dr. Han had updated his CV and tenure packet to reflect that fact. Thus, the University Committee noted that Dr. Han had published seven articles. Nevertheless, the University Committee made a unanimous decision to recommend against tenure, citing similar concerns regarding Dr. Han's productivity. In its letter dated February 11, 2022, the University Committee made a point to note Dr. Han's "serious health issues" and opined that his leaves of absence "almost certainly affected his research productivity." (ECF No. 38-33 at Temple 009810.)

Provost Mandel was next to review Dr. Han's application, and he agreed with Dean Anderson and the University Committee, noting that "there is not sufficient quality and quantity combined to meet the standards for tenure and promotion." (ECF No. 38-35 at Temple 009277.) Former President Jason Wingard also recommended that Temple deny tenure. In April 2022, the Board voted against granting tenure to Dr. Han, and his employment with Temple ended when his contract expired in June 2022.

### B.    Procedural History

On November 10, 2023, Dr. Han filed suit against Temple, alleging that Temple denied him tenure in violation of numerous anti-discrimination statutes including the Americans with Disabilities Act ("ADA"), Title VII of the Civil Rights Act of 1964, Section 1981 of the Civil Rights Act of 1866, the Age Discrimination in Employment Act ("ADEA"), the Family Medical Leave Act ("FMLA"), and the Pennsylvania Human Relations Act ("PHRA"). Temple has moved for summary judgment on all of Dr. Han's claims, and that motion is ripe for disposition.

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) permits a party to seek, and a court to enter, summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In ruling on a summary judgment motion, a court must "view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion.'" *Scott v. Harris*, 550 U.S. 372, 378 (2007) (quotation omitted).

In opposing summary judgment, "[t]he non-moving party may not merely deny the allegations in the moving party's pleadings" and "must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* (quotation omitted). "[I]nstead, he must show where in the record there exists a genuine dispute over a material fact." *Doe v. Abington Friends Sch.*, 480 F.3d 252, 256 (3d Cir. 2007) (citation omitted). If he fails to make this showing, then the Court may "consider the fact undisputed for purposes of the motion" and/or "grant summary judgment if the motion and supporting materials — including the facts considered undisputed — show that the movant is entitled to it[.]" Fed. R. Civ. P. 56(e)(2), (3).

## III.    ANALYSIS

### A.    *McDonnell Douglas* Burden-Shifting Claims

Dr. Han's claims of disparate treatment discrimination under the ADA, Title VII, and Section 1981, his claims of retaliation under the ADA and FMLA, and his parallel state claims under the PHRA are all subject to the familiar *McDonnell Douglas* burden-shifting framework.[4] To prevail on any of those claims, he must first establish a *prima facie* case. *See Canada v. Samuel Grossi & Sons, Inc.*, 49 F.4th 340, 346 (3d Cir. 2022). If he makes that showing, then the burden shifts to Temple to articulate a legitimate, non-retaliatory

---

[4]    *See Qin v. Vertex, Inc.*, 100 F.4th 458, 473 (3d Cir. 2024) (reciting framework for Title VII, Section 1981, and PHRA disparate treatment claims); *Canada*, 49 F.4th at 346 (reciting framework for ADA and FMLA retaliation claims); *Berardelli v. Allied Servs. Inst. of Rehab. Med.*, 900 F.3d 104, 126 (3d Cir. 2018) ("[T]he liability standard for the PHRA and the ADA is the same[.]"); *Shaner v. Synthes*, 204 F.3d 494, 500 (3d Cir. 2000) ("[T]he burden-shifting framework ... applies to ADA disparate treatment ... claims.").

reason for denying him tenure. *See id.* If Temple meets that burden, then the burden shifts back to Dr. Han to establish that Temple's "explanation was false, and that [discrimination or] retaliation was the real reason for the adverse employment action[s]." *Id.* (quotation omitted).

### 1.    *Prima facie* case

#### a.    ADA claims

##### i.    Disparate treatment

To establish a *prima facie* case of disparate treatment, Dr. Han must prove: (1) he has a disability within the meaning of the ADA; (2) he is "otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations ...;" and (3) he has "suffered an otherwise adverse employment decision as a result of discrimination." *Morgan v. Allison Crane & Rigging LLC*, 114 F.4th 214, 220–21 (3d Cir. 2024) (quotation omitted). Temple does not challenge the first two elements of the *prima facie* case; only the causation element is at issue.

Where a plaintiff must "show that certain conduct was 'used' as a basis for employment decisions," "timing and ongoing antagonism have often been the basis for the causal link[.]" *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 281, 283-84 (3d Cir. 2000). In this case, however, there is no evidence of unduly suggestive timing between when Dean Anderson learned about Dr. Han's disability, itself, and when he recommended against tenure; nor has Dr. Han established an ongoing pattern of

antagonism during that time period.[5] However, suspicious timing and patterns of antagonism are not the only types of evidence that can establish a causal link. Indeed, "a plaintiff may rely upon a broad array of [circumstantial] evidence" to support an inference of causation. *Id.* at 284.

Without any evidence that Dean Anderson (or any other evaluator) harbored a discriminatory animus based on Dr. Han's disability, Dr. Han attempts to rely on a cat's paw theory of liability to establish his *prima facie* case. This theory imposes liability on an employer if a non-decisionmaker's discriminatory act is the proximate cause of the adverse employment action. *See Staub v. Proctor Hosp.*, 562 U.S. 411, 420 (2011). To prevail on this theory, a plaintiff must prove three facts: (a) the non-decisionmaker acted with discriminatory intent to cause an adverse employment action; (b) the non-decisionmaker communicated with the decisionmaker; and (c) the decisionmaker relied on that communication in taking the adverse employment action against the employee. *See Staub*, 562 U.S. at 422; *Crosbie v. Highmark Inc.*, 47 F.4th 140, 146 (3d Cir. 2022) (citations omitted).

There is evidence in the record that could lead a reasonable jury to conclude that Dr. Kent harbored a discriminatory animus against Dr. Han's "medical shit"—*i.e.*, his disability—and that Dr. Kent hoped that Temple would deny him tenure.[6] In addition,

---

[5]    The same is true with respect to the other evaluators who followed Dean Anderson.

[6]    While the tenure process was ongoing, Dr. Kent wrote to a colleague that "hopefully Xu Han will be denied tenure and gone in Fall." (ECF No. 38-96 at 1.)

there is evidence that when he drafted Dean Anderson's letter, Dr. Kent included false information that "[t]he external reviewers note[d] a slow pace and irregular consistency to Dr. Han's publications ...." (ECF No. 38-7 at Temple 015331.) A jury could also conclude that Dean Anderson relied on that misrepresentation when recommending against tenure for Dr. Han, as he kept that inaccurate information in the final version of his letter.[7] However, the problem for Dr. Han is that he does not have any evidence that any of the other evaluators—including the final decisionmakers—relied on Dr. Kent's misrepresentation when recommending against tenure.

On the contrary, the record suggests that subsequent evaluators did not rely on the inaccurate information when evaluating Dr. Han's tenure application. During the next round of review, the University Committee conducted "a careful reading of all the external reviewer's letters" and determined that "it was not possible to find this comment in any of the letters." (ECF No. 38-33 at Temple 009809.) Given this evidence, no reasonable jury could conclude that the University Committee relied on Dr. Kent's misrepresentation (as set forth in Dean Anderson's letter) when it decided against tenure. In addition, while Dean Anderson's letter neglected to mention the forthcoming JBES article, the University Committee took that specific article into account, noting that Dr. Han had published five articles during his time at Temple, including "the article recently accepted by the Journal of Business and Economic Statistics ...." (*Id.* at Temple 009808.)

---

[7]    *Compare* ECF No. 38-61 at Temple 008344_001 *with* ECF No. 38-7 at Temple 015331; see also ECF No. 38 at ¶¶ 73, 80.)

Following the University Committee, Provost Mandel noted that Dr. Han had "published five articles in top journals," and he did not include the misrepresentation about the external reviewers' letters in his own recommendation letter. (ECF No. 38-35 at Temple 009276.) Instead, he noted that the seven external reviewers "all support[ed] [Dr. Han] receiving tenure and promotion to associate professor." (*Id.* at Temple 009277.) That "the Provost typically tries to support the Dean in the decision," as a general matter, does not create a genuine dispute of fact where the evidence shows that in this specific instance, Provost Mandel did not rely on the misrepresentation from Dean Anderson's letter, and he acknowledged the additional JBES publication. (ECF No. 43-1 at 255:2-4.)

Finally, there is also no evidence in the record from which a jury could conclude that President Wingard or the Board Of Trustees relied on Dr. Kent's misrepresentation. Absent such evidence, Dr. Han cannot establish the third prong of a cat's paw theory, and he cannot use that theory to establish the causation element of his *prima facie* case of disability discrimination. Thus, Temple is entitled to summary judgment on Counts I and VII of the Second Amended Complaint.

### ii.    Retaliation

To make out a *prima facie* case of retaliation under the ADA, Dr. Han must prove: (1) he engaged in protected employee activity; (2) Temple took an adverse action against him either after or contemporaneous with the protected activity; and (3) there is a causal connection between the protected activity and the adverse action. *See Canada*, 49 F.4th at 346. Requesting a reasonable accommodation under the ADA constitutes protected

activity, *see Shellenberger v. Summit Bancorp, Inc.*, 318 F.3d 183, 191 (3d Cir. 2003), and a reasonable jury could conclude that Dr. Han requested a reasonable accommodation on January 3, 2022, when he asked whether he could teach his spring statistics course online. It does not matter that "Dr. Han did not request a formal accommodation." (ECF No. 38 at 52.) It is well-established that "[t]he law does not require any formal mechanism or 'magic words,' to notify an employer … that an employee needs an accommodation." *Conneen v. MBNA Am. Bank, N.A.*, 334 F.3d 318, 332 (3d Cir. 2003) (quotation omitted). Instead, "[t]he employer must have enough information to know of 'both the disability and desire for an accommodation[.]'" *Id.* (same). Dr. Han's email advised Temple of both, and Dean Anderson admitted that he "knew that [Dr. Han] wanted to teach remotely for the upcoming semester[.]" (ECF No. 43-1 at 253:17-18.)

Construing the facts in a light most favorable to Dr. Han, a reasonable jury could conclude that there is a causal connection between his request for an accommodation and Dean Anderson's recommendation to deny him tenure. Indeed, the 3-day time span between Dr. Han's request for an accommodation and the first draft of the Dean's letter is unduly suggestive of Dr. Kent's or Dean Anderson's retaliatory motive. However, Dr. Han's retaliation claim based on his request for an accommodation nevertheless fails for the same reason his disability discrimination claim does: he cannot hold Temple liable based on a cat's paw theory. There is no evidence in the record that supports a finding that any subsequent evaluators relied on Dean Anderson's letter in reaching their own decisions.

Likewise, Dr. Han cannot prevail on a separate claim of retaliation based on making a complaint of discrimination. On January 20, 2022, Dr. Han emailed the Vice Provost Of Faculty Affairs and made clear his belief that Dean Anderson's criticism of his application "indicates his discrimination against my disability." (ECF No. 38-76 at 2.) Provost Mandel received the complaint that same day. While Dr. Han's email constitutes protected activity, he does not have evidence to establish the necessary causal link.

By this point in time, Dean Anderson had already recommended against tenure, so Dr. Han's subsequent complaint of discrimination could not have caused that decision. And Provost Mandel did not make his final decision to deny tenure until sometime between March 22 and 26, 2022. The more than two-month gap between Dr. Han's complaint and Provost Mandel's adverse decision "is not so close as to be unduly suggestive" of retaliation. *Williams v. Philadelphia Hous. Auth. Police Dep't*, 380 F.3d 751, 760 (3d Cir. 2004), *superseded by statute on other grounds as stated in Robinson v. First State Cmty. Action Agency*, 920 F.3d 182, 187-89 & n.30 (3d Cir. 2019). And Dr. Han has not pointed to a pattern of antagonism during this time period or any other circumstantial evidence that would permit a reasonable jury to conclude that Provost Mandel acted out of retaliatory animus. Thus, Dr. Han cannot maintain a retaliation claim stemming from his complaint of disability discrimination. As such, Temple is entitled to summary judgment on Counts II and VIII of the Second Amended Complaint.

### b.    FMLA retaliation claim

The requirements for a *prima facie* case of retaliation under the FMLA are the same as an ADA retaliation claim set forth above. *See Canada*, 49 F.4th at 346. There is no dispute that Dr. Han has sufficient evidence to establish the first two elements of a *prima facie* case: (1) he engaged in protected activity when he took FMLA leave in 2015 and 2016; and (2) Temple denied him tenure thereafter. However, Dr. Han's FMLA retaliation claim fails because he cannot establish the necessary causal connection between his protected activity (taking FMLA leave) and the adverse action (the denial of tenure).

Courts tend to focus "on two main factors in finding the causal link necessary for retaliation: timing and evidence of ongoing antagonism." *Abramson v. William Paterson Coll. of New Jersey*, 260 F.3d 265, 288 (3d Cir. 2001) (citation omitted). In this case, there is no evidence of either. Dr. Han took FMLA leave during the 2015 fall semester for the birth of his daughter, and then he took a second FMLA leave during the 2016 fall semester due to his myasthenia gravis. Yet Temple did not deny Dr. Han tenure until April 2022.[8] The span of more than five years between Dr. Han's most recent FMLA leave and the tenure denial is not unusually suggestive of a retaliatory motive. *See Capps v. Mondelez Glob. LLC*, 147 F. Supp. 3d 327, 337 (E.D. Pa. 2015), *aff'd*, 847 F.3d 144 (3d Cir. 2017). Likewise, Dr. Han does not have any evidence that Temple "engaged in a pattern

---

[8]    Dean Anderson made his recommendation against tenure in January of 2022.

of antagonism in the intervening period." *Id.* While Dr. Han can "rely upon a broad array of circumstantial evidence" to establish a causal link, *Farrell*, 206 F.3d at 284, the other evidence he identifies does not create a genuine dispute as to whether Temple denied him tenure in 2022 because he took FMLA leave in 2015 and 2016.

As an initial matter, Dean Anderson's 2020 letter recommending denial of tenure has little probative value, where the adverse action at issue is the denial of tenure *in 2022*. And, in any event, Dr. Han's suggestion that the 2020 letter reflects the Dean's retaliatory animus is pure speculation. In the letter, Dean Anderson made clear that Dr. Han was "only in his sixth year with respect to the tenure clock[,]" even though he had been teaching at the Fox School for eight years. (ECF No. 38-8 at 1.) He also testified that he had held Dr. Han to "the same level of standard, even though it was over a longer period[,]" and Dr. Han has no evidence to the contrary. (ECF No. 38-4 at 119:24 – 120:2.) Likewise, Dean Anderson's characterization of the "irregular consistency to Dr. Han's publications" in his 2022 letter would not permit a reasonable jury to conclude that he recommended denying tenure *in retaliation* for Dr. Han taking FMLA leave. (ECF No. 38-7 at 2.) Dr. Han, himself, appears to be drawing a link between his leave and his productivity, but he has no evidence that the Dean did the same. Dr. Han's speculation about Dean Anderson's motivation is not evidence and is therefore insufficient to demonstrate a causal connection between his FMLA leave and the denial of tenure.

Finally—and contrary to Dr. Han's assertions—the evidence of Dr. Kent's possible hostility towards Dr. Han's disability does not support a finding that Temple retaliated

against him for taking FMLA leave. Having a disability and taking FMLA leave are not one and the same. Indeed, Dr. Han's first FMLA leave had nothing to do with his disability. And any animus on Dr. Kent's part cannot be imputed to Temple without a viable cat's paw theory. Thus, the evidence of alleged disability discrimination is not sufficient to establish Dr. Han's *prima facie* case of FMLA retaliation, and Temple is entitled to summary judgment on Count VI of the Second Amended Complaint.

### c.    Title VII and Section 1981 claims

For claims of race, national origin, and sex discrimination, Dr. Han must first establish a *prima facie* case by showing that (1) he is a member of a protected class; (2) he was qualified for tenure; (3) he suffered an adverse employment action; and (4) the action occurred under circumstances that could give rise to an inference of intentional discrimination. *Qin*, 100 F.4th at 473. "The 'central focus' of the *prima facie* case is always whether the employer is treating some people less favorably than others because of their race, color, religion, sex, or national origin." *Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 798 (3d Cir. 2003) (quotation omitted). But "the precise requirements of a *prima facie* case can vary depending on the context and were 'never intended to be rigid, mechanized, or ritualistic.'" *Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 512, 122 S. Ct. 992, 997, 152 L. Ed. 2d 1 (2002) (same). To that end, while many plaintiffs rely on comparator evidence to support an inference of employment discrimination, nothing requires such evidence. *See, e.g.*, *Pivirotto v. Innovative Sys., Inc.*, 191 F.3d 344, 357 (3d Cir. 1999). Although Dr. Han alluded to comparators in his Second Amended Complaint, he does not rely on

comparator evidence to create an inference of discrimination based on race, national origin, or sex. And the other circumstantial evidence on which he relies falls short.

Dr. Han points to the Fox School's desire to hire diverse faculty as evidence that Dean Anderson recommending denying tenure based on Dr. Han's race, national origin, sex, or some combination of the three. Dr. Han's reliance on Fox's faculty hiring policy is misplaced for a few reasons. *First*, and foremost, Dr. Han is not asserting a failure-to-hire claim. So even if Fox's commitment to hiring diverse faculty factored into "ultimate hiring decision[s][,]" (ECF No. 38-58 at 3), it does not make a difference in this case because that policy did not prevent Temple from hiring Dr. Han in 2012.

*Second*, Dr. Han has failed to establish that the Fox School's desire for a diverse faculty gives rise to a reasonable inference that Temple intended to discriminate against him. As a general matter, a hiring policy that seeks to increase diversity in the workplace "is not, in and of itself, sufficient to establish a *prima facie* case of illegal discrimination. An employer has every right to be concerned with the diversity of its workforce, and the work environment." *Iadimarco v. Runyon*, 190 F.3d 151, 164 (3d Cir. 1999). To create an inference of discrimination, Dr. Han must show that Temple "actually relied upon" the diversity policy when it decided to deny him tenure. *Reed v. Agilent Techs., Inc.*, 174 F. Supp. 2d 176, 186 (D. Del. 2001) (quotation omitted). He cannot. Instead, he relies on speculation, arguing that "[t]here is no reason for a jury to doubt that this explicit hiring preference ... applied to [Dean] Anderson's tenure decisions." (ECF No. 43 at 27.) But there is a reason to doubt that—Dean Anderson confirmed that when it comes to

deciding whether to award tenure, *no* consideration is given to ethnic or racial diversity, and Dr. Han does not have any evidence to the contrary.[9]

When determining whether a plaintiff has sufficient evidence to establish a *prima facie* case, courts must "carefully distinguish between evidence that allows for a reasonable inference of discrimination and evidence that gives rise to mere speculation and conjecture." *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 448 (2d Cir. 1999). In this case, Dr. Han's argument is based on the latter. And given the unique nature of tenure and the tenure process itself, it would not be reasonable for a jury to look at the Fox School's hiring policies for faculty, in general, and assume that those policies inform an entirely distinct tenure process which is "based on the merit of the [tenure] packet itself." (ECF No. 38-4 at 75:13-14.)[10] Thus, absent any actual evidence that Temple utilized the hiring policy to deny Dr. Han tenure, evidence of the policy and the Fox School's desire for a diverse faculty does not create an inference of discrimination.

---

[9]     Likewise, Dr. Han has no evidence—only speculation—that if he was "African-American, a woman, or an African-American woman, [Dean] Anderson would have recommended" that he receive tenure. (ECF No. 43 at 28.) His argument assumes that considerations of race, national origin, or sex were factors that could mitigate against a tenure packet that fell short on the merits, but there is no evidence in the record that supports that assumption. There is no evidence that the Fox School was willing to hire, or did hire, diverse faculty who otherwise fell short of the school's standards.

[10]     In fact, Dr. Han's entire argument is premised on his assumption that Temple considered him to be non-diverse due to Dean Anderson's testimony that Temple considers Asian faculty to be white. (*See* ECF No. 38-4 at  202:3-15.) At the same time, however, the Fox School's hiring policy characterizes international faculty as diverse. Dr. Han is Chinese, and Dean Anderson testified that Temple considers him to be international. (*Id.* at 8-10.) Without any evidence to the contrary, there is no basis for a jury to infer that the hiring policy necessarily applied to Dr. Han's detriment.

For similar reasons, evidence that another professor, Edo Airoldi, flagged two potential faculty hires and noted their ethnic and racial backgrounds as positive attributes would not permit a reasonable jury to infer that Temple viewed Dr. Han's race, national origin, sex, or combination of the three as disqualifying. This is true even if Dr. Airoldi suggested that one of these professors could fill Dr. Han's position following his termination.[11] At most, Dr. Airoldi's and Dean Anderson's references to these candidates confirms what Temple admits—it sought to increase diversity among its faculty. Again, this goal does not equate to discrimination against Dr. Han.

Finally, Dr. Han's allusions to "racial balancing" and "race-based quota systems" do not help him establish a *prima facie* case of discrimination. (ECF No. 46 at 7.) Dr. Han has not pointed to any evidence that Temple takes specific measures to ensure racial balancing among its tenured faculty or that it employs any sort of quota system when making tenure decisions.[12] On the contrary, Dean Anderson testified that when it comes to tenure decisions, no consideration is given to ethnic or racial diversity, and Temple tries to "keep a blind eye towards gender or racial diversity" during the tenure process. (ECF No. 38-4 at 75:9-16.) Dr. Han has no evidence to rebut this. Instead, his argument

---

[11]    There is no evidence in the record that Temple hired any of these individuals to "replace" Dr. Han. In addition, Dr. Airoldi flagged one of these professors months ***after*** Dean Anderson recommended against tenure for Dr. Han, undermining any suggestion that the Dean denied tenure so that Temple could hire a more diverse candidate instead. (*See* ECF No. 38-54.)

[12]    That is one of the reasons that *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181 (2023) has no bearing on this case.

about racial balancing and quotas is pure conjecture, insufficient to create an inference of discrimination. Because Dr. Han cannot establish a *prima facie* case of discrimination based on race, national origin, or sex, Temple is entitled to summary judgment on Counts III, IV, and IX of his Second Amended Complaint.

Because Dr. Han does not have sufficient evidence to prove a *prima facie* case for any of his claims subject to the *McDonnell Douglas* framework, they each fail. As such, I need not consider whether Temple has a legitimate non-discriminatory reason for denying him tenure or whether he has evidence that Temple's reason was pretextual.

## B.    Remaining Claims

### 1.    FMLA interference claim

Unlike Dr. Han's other claims, his FMLA interference claim "is not about discrimination," so the *McDonnell Douglas* burden-shifting analysis does not apply. *Capps v. Mondelez Glob., LLC*, 847 F.3d 144, 155 (3d Cir. 2017) (quotation omitted). Instead, to prevail on his claim of FMLA interference, Dr. Han must establish: "(1) he ... was an eligible employee under the FMLA; (2) [Temple] was ... subject to the FMLA's requirements; (3) [Dr. Han] was entitled to FMLA leave; (4) [he] gave notice to [Temple] of his ... intention to take FMLA leave; and (5) [he] was denied benefits to which he ... was entitled under the FMLA." *Id.* (same). Temple is entitled to summary judgment on this claim because Dr. Han cannot establish the fourth and fifth elements.

There is no evidence in the record that Dr. Han notified anyone at Temple that he intended to take a third FMLA leave at some point, and Dr. Han does not argue to the

contrary. In fact, he admits that he only requested FMLA leave in 2015 and 2016. (*See* ECF No. 38 at 9.) This evidentiary gap dooms his claim. Likewise, there is no evidence in the record that Temple denied him benefits to which he was entitled under the FMLA, *i.e.* unpaid leave. The record shows that Temple provided Dr. Han with FMLA leave both times he requested it. Thus, Temple is entitled to summary judgment on Dr. Han's FMLA interference claim in Count VI of the Second Amended Complaint.

### 2.    ADEA claim

Dr. Han has abandoned his claims of age discrimination in violation of the ADEA and PHRA. Temple moved for summary judgment on these claims, and Dr. Han failed to mount any substantive response in opposition. "When a party opposing summary judgment responds to a summary judgment motion 'but fails to address the substance of any challenge to particular claims, that failure constitutes an abandonment of th[o]se causes of action and essentially acts as a waiver of these issues.'" *Reeves v. Travelers Companies*, 296 F. Supp. 3d 687, 692 (E.D. Pa. 2017) (quotation omitted). Indeed, in its Reply brief, Temple accused Dr. Han of "abandon[ing] the age claim[,]" (ECF No. 45 at 1), and Dr. Han did not challenge that assertion in his Sur-reply. Thus, I have little trouble concluding that Dr. Han has abandoned his age discrimination claims, and Temple is entitled to summary judgment on Counts V and X as a result.

## IV.    CONCLUSION

Dr. Han has does not have enough evidence to establish a prima facie case of discrimination or retaliation under the ADA, FMLA, Title VII, Section 1981, and the PHRA.

In addition, he also lacks evidence to establish an FMLA interference claim, and he has abandoned his claim under the ADEA. Thus, Temple is entitled to summary judgment on all of the claims asserted against it. An appropriate Order follows.

**BY THE COURT:**

_/s/ Joshua D. Wolson_
JOSHUA D. WOLSON, J.

October 1, 2025